**APPENDIX B:** **REMEDIAL DESIGN AGREEMENT**

# UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
## REGION 5

| | |
|---|---|
| IN THE MATTER OF: ) <br> ) <br> Lower Fox River and Green ) <br> Bay Site ) <br> ) <br> ) <br> Respondents: ) <br> ) <br> Fort James Operating Company, Inc. ) <br> and NCR Corporation. ) <br> ) <br> _____ ) | ADMINISTRATIVE ORDER ON CONSENT <br><br> U.S. EPA Region 5 <br> CERCLA Docket No. <br><br> Proceedings Under Sections 104, 106, 122(a), and 122(d)(3) of the Comprehensive Environmental Response, Compensation, and Liability Act, as Amended, 42 U.S.C. §§ 9604, 9606, 9622(a), and 9622(d)(3). |

## I. JURISDICTION AND GENERAL PROVISIONS

1.      This Administrative Order on Consent ("Consent Order") is entered into voluntarily by the United States Environmental Protection Agency ("EPA"), the State of Wisconsin ("State") through the Wisconsin Department of Natural Resources ("WDNR"), and Fort James Operating Company, Inc., a wholly owned subsidiary of Fort James Corporation, and NCR Corporation ("Respondents"). The mutual objectives of EPA, WDNR, and Respondents in entering into this Consent Order are: (i) to have Respondents perform certain design planning for Operable Units 2, 3, 4 and 5 ("OUs 2, 3, 4, and 5") of the Lower Fox River and Green Bay Site (also known as the Fox River NRDA PCB Releases Site) ("Site"), located in the State of Wisconsin, as set forth herein; (ii) to have Respondents perform certain pre-design sampling activities for OUs 2-5, as set forth herein; and (iii) to have the Respondents perform certain other remedial design activities needed for implementation of the Response Agencies' (EPA and WDNR) December 2002 selected remedy (and/or contingent remedy, as appropriate) for OU 2 at the Site and the June 2003 selected remedy (and/or contingent remedy, as appropriate) for OUs 3, 4 and 5 at the Site, including any modification to such remedies approved by EPA and WDNR.

2.      This Consent Order is issued pursuant to the authority vested in the President of the United States by Sections 104, 106, 122(a), and 122(d)(3) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9604, 9606, 9622(a), and 9622(d)(3), as amended ("CERCLA"). This authority was delegated to the Administrator of EPA on January 23, 1987, by Executive Order 12580, 52 Fed. Reg. 2926 (1987), and further delegated to EPA Regional Administrators as of January 16, 2002, by EPA Delegation Nos. 14-1 and 14-2, and to the Director, Superfund Division, EPA Region 5, by Regional Delegation Nos. 14-1 and 14-2.

3.      The activities conducted pursuant to this Consent Order are subject to approval by EPA and WDNR, as provided herein, and shall be consistent with CERCLA, the National Contingency Plan, 40 C.F.R. Part 300, and all other applicable laws.

4.      EPA, WDNR, and Respondents recognize that this Consent Order has been negotiated in good faith and that the actions undertaken by Respondents in accordance with this

Consent Order do not constitute an admission of any liability. Nothing in this Consent Order is intended by the Parties to be, nor shall it be construed as, an admission of fact or law, an estoppel, or a waiver of defenses or claims by Respondents for any purpose. The Parties agree that the provisions of this Consent Order are not based on any views or assumptions regarding Respondents' appropriate share of liability or costs relating to the Site. Participation in this Consent Order by Respondents is not intended by the Parties to be, and shall not be, an admission of any fact or opinion developed by EPA, the State, or any other person or entity.

5.      Respondents agree to comply with and be bound by the terms of this Consent Order. Respondents consent to and agree not to contest the authority or jurisdiction of the Regional Administrator of EPA Region 5 and the Secretary of the Wisconsin Department of Natural Resources or their delegatees to issue or enforce this Consent Order, and also agree not to contest the basis or validity of this Consent Order or its terms in any action to enforce its provisions. The Respondents do not, by signing this Consent Order, waive any rights they may have to assert claims under CERCLA against any person, as defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21), except as precluded by Section XXI (Other Claims).

## II. PARTIES BOUND

6.      This Consent Order applies to and is binding upon and inures to the benefit of EPA, WDNR, Respondents, and their successors and assigns. Respondents agree to instruct their officers, directors, employees and agents involved in the performance of the Work required by this Consent Order to take all necessary steps to accomplish the performance of said Work in accordance with this Consent Order. Any change in ownership or corporate status of a Respondent, including but not limited to any transfer of assets or real or personal property, shall not alter that Respondent's responsibilities under this Consent Order. Respondents shall provide a copy of this Consent Order to any subsequent owners or successors before ownership rights or stock or assets in a corporate acquisition are transferred. The signatories to this Consent Order certify that they are authorized to execute and legally bind the Parties they represent to this Consent Order.

7.      Respondents shall provide a copy of this Consent Order to all contractors, laboratories, and consultants which are retained to conduct any work performed under this Consent Order within fourteen (14) days after the Effective Date of this Consent Order or the date of retaining their services, whichever is later. Respondents shall condition any such contracts upon satisfactory compliance with this Consent Order. Notwithstanding the terms of any contract, Respondents are responsible for compliance with this Consent Order and for ensuring that their respective subsidiaries, employees, contractors, consultants, subcontractors, agents and attorneys comply with this Consent Order.

## III. DEFINITIONS

8.      Unless otherwise specified, terms used in this Consent Order which are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Consent Order or in the attachments hereto, the following definitions shall apply:

        a.      "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 et seq.

        b.      "Consent Order" shall mean this Administrative Order on Consent and all attachments hereto. In the event of conflict between this Consent Order and any attachment, this Consent Order shall control.

- 2 -

c.      "Day" shall mean a calendar day unless expressly stated to be a working day.  "Working day" shall mean a day other than a Saturday, Sunday, or federal holiday. In computing any period of time under this Consent Order, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next working day.

d.      "Effective Date" shall mean the effective date of this Consent Order as provided by Section XXVI of this Consent Order (Effective Date).

e.      "EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

f.      "EPA Past Cost Payment" shall mean the payment to be made to the Fox River Site Special Account within the EPA Hazardous Substance Superfund under Paragraph 53 (Initial Payment to the United States) of this Consent Order to reimburse EPA for a portion of its past response costs related to the Site.

g.      "Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States and the State incur after the Effective Date in reviewing or developing plans, reports and other items pursuant to this Consent Order, in verifying the Work, or in otherwise implementing, overseeing, or enforcing this Consent Order, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the access-related costs incurred pursuant to Section XII (including, but not limited to, the cost of attorney time and any monies paid to secure access including, but not limited to, the amount of just compensation) and any costs incurred pursuant to Paragraph 72 (Work Takeover).

h.      "Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a).  The applicable rate of interest shall be the rate in effect at the time the interest accrues.  The rate of interest is subject to change on October 1 of each year.

i.      "National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

j.      "Operable Unit 2" or "OU2" shall mean the second reach of the Lower Fox River, as delineated by the Record of Decision signed by WDNR and EPA in December 2002.  More specifically, OU2 is the portion of the Lower Fox River (and the underlying River sediment) starting at the Upper Appleton Dam downstream to the Little Rapids Dam.  As so defined, OU2 is depicted in Figure 7-21 of the December 2002 Final Feasibility Study, a copy of which is attached hereto as Attachment B-1.

k.      "Operable Unit 3" or "OU3" shall mean the third reach of the Lower Fox River, as delineated by the Record of Decision signed by WDNR and EPA in June 2003. More specifically, OU3 is the portion of the Lower Fox River (and the underlying River sediment) starting at the Little Rapids Dam downstream to the De Pere Dam.  As so defined, OU3 is depicted in Figure 7-26 of the December 2002 Final Feasibility Study, a copy of which is attached hereto as Attachment B-2.

l.    "Operable Unit 4" or "OU4" shall mean the fourth reach of the Lower Fox River, as delineated by the Record of Decision signed by WDNR and EPA in June 2003. More specifically, OU4 is the portion of the Lower Fox River (and the underlying River sediment) starting at the De Pere Dam and ending at Green Bay.  As so defined, OU4 is depicted in Figure 7-36 of the December 2002 Final Feasibility Study, a copy of which is attached hereto as Attachment B-3.

m.    "Operable Unit 5" or "OU5" shall mean the bay of Green Bay, as delineated by the Record of Decision signed by WDNR and EPA in June 2003.  More specifically, OU5 includes all of Green Bay from the city of Green Bay to the point where Green Bay enters Lake Michigan.  As so defined, OU5 is depicted in Figure 7-49 of the December 2002 Final Feasibility Study, a copy of which is attached hereto as Attachment B-4.

n.    "Paragraph" shall mean a portion of this Consent Order identified by an Arabic numeral.

o.    "Parties" shall mean all signatories to this Consent Order.

p.    "Performance Standards" shall mean the selected remedy requirements, contingent remedy requirements, and cleanup standards for measuring the achievement of the goals of the Remedial Action, as set forth in Sections 13.1, 13.3.1, and 13.4 through 13.6 of the ROD and Section II of the SOW for Remedial Design.

q.    "Record of Decision for OU 1-2 " or "OU 1-2 ROD" for purposes of this Consent Order shall mean the WDNR/EPA Record of Decision relating to the Remedial Action planned for Operable Units 1 and 2 of the Site, signed on December 18, 2002, by the WDNR and on December 20, 2002 by the Superfund Division Director, EPA Region 5, and all attachments.

r.    "Record of Decision for OU 3-5" or "OU 3-5 ROD" for purposes of this Consent Order shall mean the WDNR/EPA Record of Decision relating to the Remedial Action planned for Operable Units 3, 4 and 5 of the Site, signed on June 30, 2003, by the WDNR and the Superfund Division Director, EPA Region 5, and all attachments.

s.    "Remedial Design" or "RD" shall mean design planning, pre-design sampling, investigations, and analyses, preparation of the basis for design report, preliminary and final plans and specifications, and bid documents for the Remedial Action for Operable Units 2, 3, 4, and 5 pursuant to the Record of Decision for OU 1-2, the Record of Decision for OU 3-5, the Statement of Work, the RD Work Plan, and the Pre-Design Sampling Plan (the documents submitted by Respondents pursuant to Section IX of this Consent Order (Work to be Performed)).

t.    "Respondents" shall mean Fort James Operating Company, Inc. and NCR Corporation.

u.    "Response Agencies" shall mean the United States Environmental Protection Agency (EPA) and the Wisconsin Department of Natural Resources (WDNR).

v.    "Section" shall mean a portion of this Consent Order identified by a Roman numeral.

w.     "Site" shall mean the Lower Fox River and Green Bay Site (also known as the Fox River NRDA PCB Releases Site), or any relevant portion thereof.

x.     "State" shall mean the State of Wisconsin, including its departments, agencies, and instrumentalities.

y.     "Statement of Work" or "SOW" shall mean the statement of work for implementation of Remedial Design as set forth in Attachment A to this Consent Order and any modifications made in accordance with this Consent Order.

z.     "United States" shall mean the United States of America, including its departments, agencies, and instrumentalities.

aa.     "WDNR" shall mean the Wisconsin Department of Natural Resources and any successor departments or agencies of the State of Wisconsin.

bb.     "Work" shall mean all activities Respondents are required to perform under this Consent Order, except those required by Section XXIV (Record Preservation).

## IV. STATEMENT OF PURPOSE

9.     The mutual objective of EPA, WDNR and Respondents in entering into this Consent Order is to protect human health, welfare and the environment at Operable Units 2, 3, 4, and 5 by producing a Remedial Design for remedial action in accordance with this Consent Order.

10.     The activities conducted pursuant to this Consent Order are subject to approval by the Response Agencies.  Respondents shall employ sound scientific, engineering, and construction practices and all activities undertaken shall be consistent with CERCLA, the NCP, and other applicable laws.  The obligations of the Respondents to finance and perform the Work and to pay amounts owed to EPA and WDNR under this Consent Order are joint and several.  In the event of the insolvency or other failure of any one or more Respondents to implement the requirements of this Consent Order, the remaining Respondents shall complete all such requirements.

## V. FINDINGS OF FACT

11.     Based on available information, including the Administrative Record in this matter, EPA and WDNR hereby find that:

a.     At certain times in the past, primarily in the 1950's and 1960's, certain paper companies located along the Fox River engaged in the manufacture or recycling of carbonless copy paper.  Polychlorinated biphenyls (PCBs), which are hazardous substances, were used in the production of carbonless copy paper and were contained in wastepaper that entered the paper recycling operations.

b.     As a result of the paper mills' production or recycling of carbonless copy paper an estimated 690,000 pounds of PCBs were likely released to the Fox River.  An estimated 66,000 pounds of these PCBs remain in the lower 39 miles of the Fox River.

c.     As a result of this contamination, fish consumption advisories have been in effect on the Fox River and Green Bay since 1976.

d. A Remedial Investigation and Feasibility Study (RI/FS) under the technical lead of WDNR, and a proposed remedial action plan, was issued for public comment on October 5, 2001.

e. On January 7, 2003, the Response Agencies made public a Record of Decision for Operable Units 1 and 2 of the Site.

f. On June 30, 2003, the Response Agencies made public a Record of Decision for Operable Units 3, 4 and 5 of the Site.

## VI.  CONCLUSIONS OF LAW AND DETERMINATIONS

12. Based on the Findings of Fact set forth above and the Administrative Record, EPA and WDNR have determined that:

a. The Site is a "facility" as defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

b. The contamination found at the Site, as identified in the Findings of Fact above, includes "hazardous substances" as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

c. Each Respondent is a "person" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

d. Each Respondent is a responsible party under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), as: (i) the past or present "owner" or "operator" of a facility from which there was a release of a hazardous substance to the Lower Fox River; and/or (ii) as a person who arranged for disposal or transport for disposal of a hazardous substance at a facility from which there was a release of a hazardous substance.

e. The conditions described in the Findings of Fact above constitute an actual or threatened "release" of a hazardous substance from the facility into the "environment" as defined by Sections 101(8) and (22) of CERCLA, 42 U.S.C. §§ 9601(8) and (22).

f. The conditions present at the Site may present a threat to public health, welfare, or the environment based upon the factors set forth in Section 300.415(b)(2) of the National Contingency Plan, as amended, 40 C.F.R. § 300.415(b)(2).

g. The actual or threatened release of hazardous substances from the Site may present an imminent and substantial endangerment to the public health, welfare, or the environment within the meaning of Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

h. The response actions required by this Consent Order are necessary to protect the public health, welfare, or the environment and if carried out in compliance with the terms of this Consent Order, shall be deemed consistent with the NCP.

## VII.  ORDER

13. Based upon the foregoing Findings of Fact, Conclusions of Law and Determinations, and the Administrative Record for this Site, it is hereby Ordered and Agreed that Respondents shall comply with all provisions of this Consent Order. Respondents shall

- 6 -

promptly and properly take appropriate response action at Operable Units 2, 3, 4, and 5 of the Site by conducting the Remedial Design.

## VIII. DESIGNATION OF CONTRACTORS AND PROJECT COORDINATORS

14.  <u>Selection of Contractors, Personnel</u>.  All Work performed by Respondents pursuant to this Consent Order shall be under the direction and supervision of qualified personnel.  Within forty-five (45) days of the Effective Date of this Consent Order, and before the Work outlined below begins, Respondents shall notify the Response Agencies in writing of the names, titles, and qualifications of the key personnel, including contractors, subcontractors, consultants and laboratories to be used in carrying out such Work.  With respect to any proposed contractor, the Respondents shall demonstrate that the proposed contractor has a quality system which complies with ANSI/ASQC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs," (American National Standard, January 5, 1995), by submitting a copy of the proposed contractor's Quality Management Plan (QMP).  The QMP shall be prepared in accordance with "EPA Requirements for Quality Management Plans (QA/R-2)" (EPA/240/B-01/002, March 2001) or equivalent documentation as determined by EPA.  The qualifications of the key personnel undertaking the work for Respondents shall be subject to the Response Agencies' review, for verification that such persons meet minimum technical background and experience requirements.

15.  If EPA or WDNR disapproves in writing of any contractor proposed by Respondents (such writing to contain the basis for such disapproval), Respondents shall notify the Response Agencies of the identity and qualifications of the replacement within thirty (30) days of the written notice.  If EPA or WDNR subsequently disapproves of the replacement, EPA reserves the right to terminate this Consent Order and to conduct a complete Remedial Design, and to seek reimbursement for costs and penalties from Respondents.  During the course of the Remedial Design, Respondents shall notify the Response Agencies in writing of any changes or additions in the key personnel used to carry out such work, providing their names, titles, and qualifications.  The Response Agencies shall have the same right to approve changes and additions to key personnel as they have hereunder regarding the initial notification.  Replacement of any of Respondents' personnel shall not delay performance of the work under this Consent Order.

16.  On or before the Effective Date of this Consent Order, Respondents shall designate a Project Coordinator who shall be responsible for administration of all Respondents' response actions required by the Consent Order.  Respondents shall submit to the Response Agencies the designated Project Coordinator's name, address, telephone number, and qualifications.  EPA and WDNR retain the right to disapprove of any Project Coordinator named by Respondents.  If either Response Agency disapproves a selected Project Coordinator, Respondents shall retain a different Project Coordinator and shall notify the Response Agencies of that person's name and qualifications within seven (7) business days of the Response Agency's disapproval.

17.  Receipt by Respondents' Project Coordinator of any notice or communication from the Response Agencies relating to this Consent Order shall constitute receipt by each Respondent.  To the maximum extent possible, communications between the Respondents and the Response Agencies shall be directed to the Project Coordinators by mail or other written method of communication agreed to by the Project Coordinators, with copies to such other persons as EPA, the State, and Respondents may respectively designate.  Communications include, but are not limited to, all documents, reports, approvals, and other correspondence submitted under this Consent Order.

18.     Respondents' Project Coordinator, or his/her designee, shall be on-site during all hours of work when field work is ongoing in Operable Unit 2, 3, 4 or 5 and shall be available at all reasonable times throughout the pendency of this Consent Order.  If Respondents or their agents become aware of any conditions at Operable Unit 2, 3, 4 or 5 which may present an imminent and substantial endangerment to human health or welfare or the environment, they shall immediately notify the EPA and WDNR Project Coordinators.  The absence of the EPA Project Coordinator and/or the WDNR Project Coordinator from the area under study pursuant to this Consent Order shall not be cause for the stoppage or delay of work, unless specifically directed by the EPA Project Coordinator in consultation with the WDNR Project Coordinator.

19.     The EPA Project Coordinator shall be responsible for overseeing the implementation of this Consent Order, in consultation with the WDNR Project Coordinator. EPA has designated James Hahnenberg (SR-6J) as the EPA Project Coordinator.  The EPA Project Coordinator shall have the same authority as that vested in an On-Scene Coordinator and Remedial Project Manager by the NCP, including the authority to halt, conduct, or direct any response action required by this Consent Order, or to direct any other response action undertaken by EPA or Respondents at the Site.  Except as otherwise provided in this Consent Order, Respondents shall direct all submissions required by this Consent Order to the EPA Project Coordinator in accordance with Section XXV (Notices and Submissions).

20.     The State designates Gregory Hill as the WDNR Project Coordinator.  Except as otherwise provided in this Consent Order, Respondents shall direct all submissions required by this Consent Order to the WDNR Project Coordinator in accordance with Section XXV (Notices and Submissions).

21.     The Response Agencies and Respondents shall have the right to change their respective designated Project Coordinator.  The Response Agencies shall notify Respondents, and Respondents shall notify the Response Agencies, as early as possible before such a change is made, but in no case less than twenty-four (24) hours before such a change.  The initial notification may be made orally, but it shall be promptly followed by a written notice.

## IX. WORK TO BE PERFORMED

22.     <u>Activities</u>.  Respondents shall conduct activities and submit deliverables as provided by the Statement of Work ("SOW") (Attachment A) for performance of the RD, which is incorporated by reference.  All such work shall be conducted in accordance with CERCLA, the NCP, and EPA guidance referenced in the SOW, as such guidance may be amended or modified by EPA.  The tasks that Respondents must perform are described in the SOW and guidance.  All work performed under this Consent Order shall be in accordance with the schedules herein and in schedules approved in the future by the Response Agencies, and in full accordance with the standards, specifications, and other requirements of the RD Work Plan and Pre-Design Sampling Plan, as initially approved or modified by the Response Agencies, and as may be amended or modified by the Response Agencies from time to time pursuant to this Consent Order.

23.     Respondents' compliance with the Work requirements shall not foreclose the Response Agencies from seeking compliance with all other terms and conditions of this Consent Order.

24.     To the extent that EPA informs Respondents that particular information is confidential, Respondents and their representatives and consultants shall treat and maintain such information as confidential.

25.     Additional Work.  In the event EPA, WDNR or the Respondents determine that additional Remedial Design work, not otherwise included in the SOW, including remedial investigatory work and engineering evaluation, is necessary to accomplish the objectives of this Consent Order, notification of additional work shall be provided to all Parties.

26.     Additional work determined to be necessary by Respondents shall be subject to the written approval of the Response Agencies.

27.     Additional work determined to be necessary by Respondents and approved by the Response Agencies, or determined to be necessary by EPA or WDNR and requested of Respondents, shall be completed by Respondents in accordance with the standards and specifications determined or approved by the Response Agencies.  Respondents shall propose a schedule for additional work for approval by the Response Agencies.  The Response Agencies may jointly modify or determine the schedule for additional work.  Additional work shall be performed in a manner consistent with the purposes and objectives of this Consent Order, and conform with the requirements of this Section.

28.     Supplemental Investigations.  The parties acknowledge that Respondents may implement voluntary, supplemental work relating to OUs 2, 3, 4, and/or 5 or issues relating to remedial design not specifically covered herein.  Such supplemental work shall be structured so as to not interfere with or delay completion of Respondents' primary obligations and deadlines as specified in this Order and the SOW.  EPA and WDNR agree to review and comment promptly on such work generated by Respondents and to consider any recommendations made by Respondents.  Review by EPA and WDNR of plans or other submissions otherwise required by this Order, however, shall take priority over review of supplemental work generated pursuant to this Paragraph.

29.     Out-of-State Shipments.  In the event of out-of-state shipments of hazardous substances, Respondents shall provide written notification to the Response Agencies and the appropriate environmental official of the state receiving hazardous substances prior to shipment of hazardous substances in quantities greater than ten (10) cubic yards from the Site to an out-of-state location.  The notification shall include:

      a.     The name and location of the facility receiving the hazardous substances;

      b.     The type and quantity of the hazardous substances, including the Department of Transportation shipping code, if any;

      c.     The schedule for shipment of the hazardous substances;

      d.     The method of transportation; and

      e.     Any special procedures necessary to respond to an accidental release of the substances during transportation.

Respondents shall promptly notify the Response Agencies and the appropriate environmental official for the receiving state of any changes to the shipment plan.

## X.  PLANS AND SUBMISSIONS

30.     Respondents shall submit the RD Work Plan, the Pre-Design Sampling Plan, and all other documents required by the SOW and by those Plans in both a hard copy and an electronic format.

31.	All submissions under this Consent Order and under any plan required by this Consent Order shall be subject to review and approval by the Response Agencies.  The Response Agencies shall respond to each submission in writing with a single integrated response.  As a result of their review of a submission, the Response Agencies may:  (a) approve the submission; (b) approve the submission with minor modifications; (c) disapprove the submission and direct Respondents to re-submit the document after incorporating the Response Agencies' comments; or (d) if a re-submission, disapprove the re-submission with the explanation for the disapproval, after which the Response Agencies may assume responsibility for performing all or any part of the response action.

32.	In the event of approval or approval with minor modifications by the Response Agencies, Respondents shall proceed to take any action required by the submittal, as approved or modified by the Response Agencies.

33.	Upon receipt of a notice of disapproval, Respondents shall, within forty-five (45) days or such longer time as specified by the Response Agencies in their notice of disapproval, correct the deficiencies and resubmit the submittal for approval.  Notwithstanding the notice of disapproval, Respondents shall proceed, if so directed by the Response Agencies, to take any action required by any non-deficient portion of the submission that remains unaffected by the notice of disapproval and can be reasonably implemented in the interim.

34.	If any re-submission is not approved by the Response Agencies, they may determine that Respondents are in violation of this Consent Order, unless Respondents invoke the procedures set forth in Section XV (Dispute Resolution) and the Response Agencies' determination is revised pursuant to that Section.  Issues previously resolved pursuant to the procedures set forth in Section XV may not be re-disputed.

35.	Neither failure of the Response Agencies to expressly approve or disapprove of Respondents' document within the specified time period nor the absence of comments shall be construed as approval of the document.  In the event of subsequent disapproval of a revised document, the Response Agencies retain the right to terminate this Consent Order and perform additional studies or conduct a complete or partial Remedial Design.

36.	For any document required to be submitted by the Respondents to the Response Agencies, within forty-five (45) days of receipt of the document, the Response Agencies shall provide written notification to Respondents of their approval, approval with minor modifications or disapproval, of the submission or any part thereof.  If the Response Agencies require a longer review period, the Response Agencies shall so notify Respondents within thirty (30) days of receipt of the submitted document.

37.	The Project Coordinators shall hold progress report meetings / telephone conferences twice a month unless such a meeting is deemed unnecessary by the Response Agencies.  By mutual agreement, the Project Coordinators may hold meetings or telephone conferences at more frequent intervals.

38.	Respondents shall provide written progress reports to the Response Agencies every month (or on any other schedule agreed to in writing by the Project Coordinators).  These monthly progress reports shall include the following information:

	a.	A description of the actions which have been taken to comply with this Consent Order during the past month and work planned for the coming month;

- 10 -

b.      All results of sampling and tests, including raw data and validated data, and all other investigation results received by the Respondents during the month, in the format prescribed by the Response Agencies;

c.      Target and actual completion dates of each element of the RD, including project completion, with schedules relating such work to the overall project schedule for RD completion, and an explanation of any deviation or anticipated deviation from the schedule approved by the Response Agencies, and proposed method of mitigating such deviation;

d.      A description of all problems encountered and any anticipated problems during the reporting period, any actual or anticipated delays, and solutions developed and implemented to address any actual or anticipated problems or delays; and,

e.      Changes in key personnel.

39.     Respondents shall submit the monthly progress reports, as both electronic files and hard copy files, to the Response Agencies by the tenth (10th) day of every month following the Effective Date of this Consent Order.

## XI. QUALITY ASSURANCE AND DATA AVAILABILITY

40.     Quality Assurance.  Respondents shall consult with the Response Agencies' Project Coordinators in planning any and all sampling and analysis required by the RD Work Plan and the Pre-Design Sampling Plan.  Respondents shall assure that work performed, samples taken and analyses conducted conform to the requirements of the SOW, the Quality Assurance Project Plan ("QAPP") and guidance identified therein.

41.     Respondents shall prepare preliminary and final QAPPs for submittal to the Response Agencies according to the schedule in the SOW.  Respondents shall participate in a pre-QAPP meeting with the Response Agencies prior to submission of the preliminary QAPP to discuss its contents.

42.     The QAPPs shall be subject to review, modification, and approval by the Response Agencies in accordance with Section X (Plans and Submissions).

43.     Data Availability.  All results of sampling, tests, modeling or other data (including raw data) generated by Respondents, or on Respondents' behalf, pursuant to this Consent Order, shall be submitted in the format prescribed by the Response Agencies and made available to and submitted to the Response Agencies in the progress reports described in Section X of this Consent Order.

44.     Respondents will verbally notify the Response Agencies at least fifteen (15) days prior to conducting significant field events (including any sampling, tests and other data generation) as described in the SOW, the RD Work Plan, and the Pre-Design Sampling Plan or conducted under any other provision in this Consent Order.  Respondents shall allow split or duplicate samples to be taken by the Response Agencies (and their authorized representatives) of any samples collected by the Respondents in implementing this Consent Order.  All split samples of Respondents' shall be analyzed by the methods identified in the EPA-approved QAPP.

45.     Respondents may assert a claim of business confidentiality covering part or all of the information submitted to the Response Agencies pursuant to the terms of this Consent Order

- 11 -

under 40 C.F.R. § 2.203, provided such claim is allowed by Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7). This claim shall be asserted in the manner described by 40 C.F.R. § 2.203(b) and substantiated at the time the claim is made. Information determined to be confidential by EPA will be given the protection specified in 40 C.F.R. Part 2. If no such claim accompanies the information when it is submitted to the Response Agencies, it may be made available to the public by EPA or the State without further notice to the Respondents. Respondents agree not to assert confidentiality claims with respect to any data related to Operable Units 2, 3, 4 or 5 conditions, sampling, or monitoring.

46.     In entering into this Consent Order, Respondents waive any objections to the quality of any data gathered, generated, or evaluated by EPA, the State or Respondents in the performance or oversight of the work that has been verified according to the quality assurance/quality control (QA/QC) procedures required by the Consent Order or any Work Plan, Sampling Plan, or Implementation Plan approved by the Response Agencies. If Respondents object to any data relating to the RD, Respondents shall submit to the Response Agencies a report that identifies and explains its objections, describes the acceptable uses of the data, if any, and identifies any limitations to the use of the data. The report must be submitted to the Response Agencies within thirty (30) days of the monthly progress report or such other report as may contain the data.

47.     Respondents may assert that certain documents, records and other information are privileged under the attorney-client privilege or the work product doctrine. If a Respondent asserts such a privilege in lieu of providing documents, it shall inform the Response Agencies that it is claiming certain documents as privileged and shall, upon request, provide the Response Agencies with the following:

        a.      The title of the document;

        b.      The date of the document, record, or information;

        c.      The name and title of the author of the document, record, or information;

        d.      The name and title of each addressee and recipient;

        e.      A description of the contents of the document, record, or information; and

        f.      The privilege asserted by the Respondent.

48.     Failure to challenge a Respondent's assertion of privilege by EPA or WDNR during the implementation of the RD does not waive the Response Agencies' right to challenge the assertion during the implementation of the Remedial Action.

## XII. ACCESS

49.     To the extent that Operable Units 2, 3, 4 or 5 or other on-site and off-site areas where work is to be performed are presently owned by parties other than Respondents, Respondents shall obtain, or use their best efforts to obtain, access agreements from the present owners within sixty (60) days of approval of the RD Work Plan. For purposes of this Paragraph, "best efforts" includes the payment of reasonable sums of money in consideration of access. Access agreements shall provide access for the Response Agencies and all authorized representatives of the Response Agencies. Respondents shall immediately notify the Response Agencies if, after using their best efforts, they are unable to obtain such agreements. Respondents shall describe in writing their efforts to obtain access. The Response Agencies may

- 12 -

then assist Respondents in gaining access, to the extent necessary to effectuate the activities required by this Consent Order, using such means as the Response Agencies deem appropriate. All costs incurred, direct or indirect, by the United States or the State in obtaining such access including, but not limited to, the cost of attorney time and the amount of monetary consideration paid or just compensation shall be considered Future Response Costs. In accordance with Paragraph 54 (Payment of Future Response Costs), Respondents may be required to reimburse the United States and the State for all such Future Response Costs.

50.     At all reasonable times the Response Agencies and their authorized representatives shall have the authority to enter and freely move about all property owned by Respondents at Operable Units 2, 3, 4 and 5 and at any other on-site and off-site areas where work under this Consent Order, if any, is being performed, for the purposes of inspecting conditions, activities, the results of activities, records, operating logs, and contracts related to Operable Unit 2, 3, 4 or 5 pursuant to this Consent Order; reviewing Respondents' progress in carrying out the terms of this Consent Order; conducting tests as the Response Agencies or their authorized representatives deem necessary consistent with this Consent Order; using a camera, sound recording device or other documentary type equipment for purposes of documenting the Work; and verifying the data submitted to the Response Agencies by Respondents. Respondents shall allow these persons to inspect and copy all records, files, photographs, documents, sampling and monitoring data, and other writings related to work undertaken in carrying out this Consent Order, subject to Paragraph Nos. 43-48. Nothing herein shall be interpreted as limiting or affecting the Response Agencies' right of entry or inspection authority under federal law or state law. All individuals with access to Operable Units 2, 3, 4 and 5 under this Paragraph shall comply with all approved health and safety plans.

## XIII. COMPLIANCE WITH APPLICABLE LAWS

51.     Respondents shall perform all Work under this Consent Order in compliance with applicable federal, state and local laws, ordinances, or regulations. In the event a conflict arises between these laws, ordinances, or regulations, Respondents shall comply with the more stringent law, ordinance, or regulation, unless otherwise approved by EPA.

52.     As provided in Section 121(e) of CERCLA and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, Respondents shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals. The standards and provisions of Section XVI (Force Majeure) shall govern delays in obtaining such permits. The Response Agencies shall cooperate with Respondents and endeavor to expedite the issuance of permits for off-site work within their respective jurisdictions.

## XIV. PAYMENT OF RESPONSE COSTS

53.     Initial Payment to the United States. Within thirty (30) days after the Effective Date, the Respondents shall pay a total of $600,000 to the Fox River Site Special Account within the EPA Hazardous Substance Superfund, as the EPA Past Cost Payment. The EPA Past Cost Payment shall be retained and used to conduct or finance response actions at or in connection with the Site, or transferred by EPA to the EPA Hazardous Substance Superfund.

- 13 -

54.     Payment of Future Response Costs.

a.     Future Cost Payments to EPA.  On a periodic basis, the United States will send Respondents a bill requiring payment that includes an EPA cost summary, which includes direct and indirect costs incurred by EPA and its contractors, and a U.S. Department of Justice cost summary, which reflects costs incurred by the U.S. Department of Justice and its contractors, if any.  Respondents shall make all payments within forty-five (45) days of Respondents' receipt of each bill requiring payment, except as otherwise provided by Paragraph 55.  Payments to EPA under this Subparagraph shall be deposited in the Fox River Site Special Account within the EPA Hazardous Substance Superfund, to be retained and used to conduct or finance response actions at or in connection with the Site, or transferred by EPA to the EPA Hazardous Substance Superfund.

b.     Future Cost Payments to the State.  On a periodic basis, the State will send Respondents a bill requiring payment that includes a WDNR cost summary, which includes direct and indirect costs incurred by WDNR and its contractors, and a Wisconsin Department of Justice cost summary, which reflects costs incurred by the Wisconsin Department of Justice and its contractors, if any.  Respondents shall make all payments within forty-five (45) days of Respondents' receipt of each bill requiring payment, except as otherwise provided by Paragraph 55.

55.     Disputes Regarding Future Response Costs.  Respondents may contest payment of any Future Response Costs under Paragraph 54 if they determine that the United States or the State has made an accounting error or if they allege that a cost item that is included represents costs that are inconsistent with the NCP.  Notice of any such objection shall be made in writing within forty-five (45) days of receipt of the bill and must be sent to the United States (if the United States' accounting is being disputed) or to the State (if the State's accounting is being disputed) pursuant to Section XXV (Notices and Submissions).  Any such notice of objection shall specifically identify the contested Future Response Costs and the basis for objection.  In the event of an objection, all uncontested Future Response Costs shall immediately be paid to the United States or the State in the manner described in Paragraph 56.  Upon submitting a notice of objection, Respondents shall initiate the Dispute Resolution procedures in Section XV (Dispute Resolution).  If the United States or the State prevails in the dispute, within ten (10) days of the resolution of the dispute, all sums due (with accrued Interest) shall be paid to EPA (if the United States' cost are disputed) or to the State (if the State's costs are disputed) in the manner described in Paragraph 56.  If Respondents prevail concerning any aspect of the contested costs, the portion of the costs (plus associated accrued Interest) for which they did not prevail shall be disbursed to EPA or the State, as appropriate, in the manner described in Paragraph 56; and the amount that was successfully contested need not be paid to EPA or to the State.  The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XV (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding reimbursement of the United States and the State for their Future Response Costs.

56.     Payment Instructions.

a.     Payments to EPA.  All payments to EPA under this Section shall be made by a certified or cashier's check or checks made payable to "EPA Hazardous Substance Superfund, Fox River Site Special Account."  All payments to EPA under Section XVII (Stipulated Penalties) shall be made by a certified or cashier's check or checks made payable to "EPA Hazardous Substance Superfund."  Each check shall also:  (1) reference the Lower Fox River and Green Bay Site, EPA Site/Spill ID Number A565, and DOJ Case Number 90-11-2-1045/3; (2) indicate that the payment is being made pursuant to this Consent Order; and (3) be sent to:

- 14 -

U.S. Environmental Protection Agency, Region 5
Program Accounting and Analysis Branch
P.O. Box 70753
Chicago, IL  60673

At the time of payment, Respondents shall ensure that notice that payment has been made is sent to DOJ and EPA in accordance with Section XXV (Notices and Submissions) and to:

Financial Management Officer
U.S. Environmental Protection Agency, Region 5
Mail Code MF-10J
77 W. Jackson Blvd.
Chicago, IL  60604

The payments deposited in the Fox River Site Special Account under this Consent Order shall be retained and used to conduct or finance response actions at or in connection with the Site, or transferred by EPA to the EPA Hazardous Substance Superfund.

b.   Payments to the State.  All payments to the State under this Section or under Section XVII (Stipulated Penalties) shall:  (1) be made by a certified or cashier's check or checks made payable to "Wisconsin Department of Natural Resources;" (2) reference the Lower Fox River and Green Bay Site; (3) indicate that the payment is being made pursuant to this Consent Order; and (4) be sent to:

Gregory Hill
WDNR Project Coordinator
Wisconsin Department of Natural Resources

P.O. Box 7921                          101 S. Webster St.
Madison, WI  53707-7921                Madison, WI  53703
(Regular Mail)                         (Over-Night Mail)

At the time of payment, Respondents shall ensure that notice that payment has been made is sent to the State in accordance with Section XXV (Notices and Submissions).

## XV.  DISPUTE RESOLUTION

57.   The parties to this Consent Order shall attempt to resolve, expeditiously, informally, and in good faith, any disagreements concerning this Consent Order.

58.   Any disputes concerning activities or deliverables required under this Consent Order shall be resolved as follows:  Respondents shall notify the Response Agencies in writing of their objection(s) within fourteen (14) calendar days of receiving notice of the Response Agencies' action giving rise to the dispute.  The Parties may agree in writing to extend this time period to provide additional time for informal discussion of the dispute.  Respondents' written notice shall include a statement of the issues in dispute, the relevant facts upon which the dispute is based, all factual data, analysis or opinion supporting Respondents' position, and all supporting documentation on which Respondents rely.  The Response Agencies shall submit their Statement of Position, including supporting documentation, no later than fourteen (14) calendar days after receipt of Respondents' written notice of dispute.  Respondents may submit a response to the Response Agencies' Statement of Position within five (5) business days after receipt of the Statement.  During the five (5) business days following the deadline for the Respondents' response to the Response Agencies' Statement of Position, the parties shall

- 15 -

attempt to negotiate, in good faith, a resolution of their differences. The time periods for exchange of written documents may be extended by agreement of all Parties.

59. An administrative record of any dispute under this Section shall be maintained by EPA and shall contain the notice of objections and accompanying materials, the Statement of Position, all materials exchanged during the dispute resolution process (including any independent expert review information pertinent to the dispute), any other correspondence between the Response Agencies and Respondents regarding the dispute, and all supporting documentation. The administrative record shall be available for inspection by all parties. If the Response Agencies do not concur with the position of Respondents, the Division Director for the Office of Superfund, EPA Region V, in consultation with an appropriate WDNR representative, shall resolve the dispute based upon the administrative record and consistent with the terms and objectives of this Consent Order, and shall provide written notification of such resolution to Respondents. If Respondents engage an independent expert to review a technical issue relating to the dispute, Respondents will be afforded an opportunity to meet and present their position to the Division Director of the Office of Superfund, EPA Region V, and an appropriate WDNR representative, prior to a decision being made to resolve the dispute.

60. Respondents' obligations under this Consent Order, other than the obligations affected by the dispute, shall not be tolled by submission of any objection for dispute resolution under this Section. Elements of Work and/or obligations not affected by the dispute shall be completed in accordance with the schedule contained in the Statement of Work. Following resolution of the dispute, as provided by this Section, Respondents shall fulfill the requirement that was the subject of the dispute in accordance with the agreement reached or with EPA's decision, whichever occurs.

## XVI. FORCE MAJEURE

61. Respondents agree to perform all requirements under this Consent Order within the time limits established under this Consent Order, unless the performance is delayed by a *force majeure*. For purposes of this Consent Order, a *force majeure* is defined as any event arising from causes beyond the control of Respondents or of any entity controlled by Respondents, including but not limited to its contractors and subcontractors, that delays or prevents performance of any obligation under this Consent Order despite Respondents' best efforts to fulfill the obligation. *Force majeure* does not include financial inability to complete the response actions or increased cost of performance.

62. If any event occurs or has occurred that may delay the performance of any obligation under this Consent Order, whether or not caused by a *force majeure* event, Respondents shall notify the Response Agencies orally within seven (7) business days of when Respondents first knew that the event might cause a delay. Within fourteen (14) calendar days thereafter, Respondents shall provide to the Response Agencies in writing an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Respondents' rationale for attributing such delay to a *force majeure* event if it intends to assert such a claim; and a statement as to whether, in Respondents' opinion, such event may cause or contribute to an endangerment to public health, welfare or the environment. Failure to comply with the above requirements shall preclude Respondents from asserting any claim of *force majeure* for that event for the period of time of such failure to comply and for any additional delay caused by such failure.

- 16 -

63. If EPA, following consultation with the State, agrees that the delay or anticipated delay is attributable to a *force majeure* event, the time for performance of the obligations under this Consent Order that are affected by the *force majeure* event will be extended by the Response Agencies for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the *force majeure* event shall not, of itself, extend the time for performance of any other obligation. If EPA, following consultation with the State, does not agree that the delay or anticipated delay has been or will be caused by a *force majeure* event, EPA will notify Respondents in writing of its decision. If EPA, following consultation with the State, agrees that the delay is attributable to a *force majeure* event, EPA will notify Respondents in writing of the length of the extension, if any, for performance of the obligations affected by the *force majeure* event.

## XVII.  STIPULATED PENALTIES

64. Respondents shall be liable for payment into the Hazardous Substances Superfund administered by EPA of the sums set forth below as stipulated penalties for each week or part thereof that Respondents fail to comply with a work schedule or payment schedule in accordance with the requirements contained in this Consent Order, unless the EPA, following consultation with the State, determines that such a failure or delay is attributable to *force majeure* as defined in Section XVI or is otherwise approved by EPA. Such sums shall be due and payable within thirty (30) days of receipt of written notification from EPA specifically identifying the noncompliance and assessing penalties, unless Respondents invoke the procedures of Section XV (Dispute Resolution). For failure to submit the RD Work Plan or the Pre-Design Sampling Plan as required by this Consent Order, stipulated penalties shall accrue in the amount of $1,000 per day for the first seven (7) days and $2,500 per day for each day thereafter. Stipulated penalties for all other violations of this Consent Order shall accrue in the amount of $1,000 for the first week or part thereof, and $1,500 for each week or part thereof thereafter. Stipulated penalties shall begin to accrue on the day that performance is due or a violation occurs and extends through the period of correction. Stipulated penalties for late payment or non-payment of Future Response Costs owed to the State shall be paid to the State under Subparagraph 56.b. All other stipulated penalties shall be paid to EPA under Subparagraph 56.a.

65. The stipulated penalties set forth herein shall not preclude the Agencies from electing to pursue any other remedy or sanction because of Respondents' failure to comply with any of the terms of this Consent Order, including a suit to enforce the terms of this Consent Order. Said stipulated penalties shall not preclude EPA from seeking statutory penalties up to the amount authorized by law if Respondents fail to comply with any requirements of this Consent Order. Provided, however, that the United States shall not seek civil penalties pursuant to Section 122(1) of CERCLA for any violation for which a stipulated penalty is provided herein, except in the case of a willful violation of this Consent Order.

66. Upon receipt of written demand from EPA, Respondents shall make payment to EPA within thirty (30) days and Interest shall accrue on late payments. Payments shall be made in accordance with instructions provided by EPA in the written demand. If Respondents fail to pay stipulated penalties when due, EPA may institute proceedings to collect the penalties, as well as Interest.

67. Even if violations are simultaneous, separate penalties shall accrue for separate violations of this Consent Order. Penalties shall accrue regardless of whether EPA has notified Respondents of a violation or act of noncompliance. The payment of penalties shall not alter in any way Respondents' obligation to complete the performance of any work required under this Consent Order. Stipulated penalties shall accrue during any dispute resolution period concerning the particular penalties at issue, but need not be paid until fifteen (15) days after the dispute is

- 17 -

resolved by agreement or by receipt of EPA's decision. If Respondents prevail upon resolution, Respondents shall pay only such penalties as the resolution requires. In its unreviewable discretion, EPA may waive its rights to demand all or a portion of the stipulated penalties due under this Section.

## XVIII.  COVENANTS NOT TO SUE BY EPA AND WDNR

68.    a.    In consideration of the actions that will be performed under the terms of this Consent Order, and except as otherwise specifically provided in this Consent Order, EPA covenants not to sue or to take administrative action against Respondents pursuant to Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§ 9606 and 9607(a), for performance of the Work.

b.    In consideration of the actions that will be performed under the terms of this Consent Order, and except as otherwise specifically provided in this Consent Order, WDNR covenants not to sue or to take administrative action against Respondents pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), or Wisconsin statutory or common law, for performance of the Work.

c.    These covenants not to sue shall take effect upon the Effective Date and are conditioned upon the complete and satisfactory performance by Respondents of all obligations under this Consent Order.

d.    These covenants not to sue extend only to Respondents and do not extend to any other person; provided, however, that these covenants not to sue (and the reservations thereto) shall also apply to:  (i) Fort James Corporation; (ii) the successors and assigns of the Respondents and Fort James Corporation, but only to the extent that the alleged liability of the successor or assign is based on the alleged liability of the Respondents or Fort James Corporation; and (iii) the officers, directors, and employees of the Respondents and Fort James Corporation, but only to the extent that the alleged liability of the director, officer or employee is based on said person's status as an officer or employee of the Respondents or Fort James Corporation, or as a result of conduct within the scope of such person's employment or authority.

## XIX.  RESERVATIONS OF RIGHTS BY EPA AND WDNR

69.    Except as specifically provided in this Consent Order, and subject to the provisions of Paragraph 71, nothing herein shall limit the power and authority of EPA, the United States, or the State to take, direct, or order all actions necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants or contaminants, or hazardous or solid waste on, at, or from the Site. Further, subject to the provisions of Paragraph 71, nothing herein shall prevent EPA or WDNR from seeking legal or equitable relief to enforce the terms of this Consent Order, from taking other legal or equitable action as it deems appropriate and necessary, or from requiring Respondents in the future to perform additional activities pursuant to CERCLA or any other applicable law.

70.    The covenant not to sue set forth in Section XVIII above does not pertain to any matters other than those expressly identified therein. Subject to the provisions of Paragraph 71, EPA and WDNR reserve, and this Consent Order is without prejudice to, all rights against Respondents and Fort James Corporation with respect to all other matters, including, but not limited to:

- 18 -

a. claims based on a failure by Respondents to meet a requirement of this Consent Order;

b. liability for past or future response costs incurred or paid by the United States or the State for the Site (except for any Future Response Costs paid pursuant to this Consent Order);

c. liability for performance of response action other than the Work;

d. criminal liability;

e. liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

f. liability arising from the past, present, or future disposal, release or threat of release of Waste Materials outside of the Site; and

g. liability for costs incurred or to be incurred by EPA for costs of the Agency for Toxic Substances and Disease Registry related to the Site.

71.    a.    On December 10, 2001, the U.S. District Court for the Eastern District of Wisconsin entered a Consent Decree in the civil action entitled *United States and the State of Wisconsin v. Appleton Papers Inc. and NCR Corporation*, Case No. 01-C-0816 (E.D. Wis.) ("API/NCR Interim Decree"). The API/NCR Interim Decree included, *inter alia*, a temporary covenant not to sue under Paragraph 22 thereof. The Parties acknowledge that the API/NCR Interim Decree does not limit or otherwise affect: (i) the Response Agencies' rights to enforce the provisions of this Consent Order; or (ii) NCR's obligations as set forth in this Consent Order. Likewise, this Consent Order does not limit or otherwise affect the rights or obligations of the parties under the API/NCR Interim Decree, except as provided by this Paragraph.

b.    Nothing in this Consent Order shall affect any covenants not to sue provided to Fort James Operating Company or Fort James Corporation by the July 22, 1999 Agreement Between the State of Wisconsin and Fort James Corporation, the May 26, 2000 EPA Administrative Order on Consent captioned In re Lower Fox River Sediment Management Unit 56/57 Removal Action, EPA Docket No. V-W-00-596, or the Consent Decree lodged on June 20, 2002 in the civil action entitled United States of America and State of Wisconsin v. Fort James Operating Company, Civ. Act. No. 02-C-0602 (E.D. Wis.).

c.    EPA, the State, Fort James Operating Company, and Fort James Corporation hereby terminate the January 29, 2003 Administrative Order on Consent captioned In re Lower Fox River and Green Bay Site Contaminant Delineation, CERCLA Docket No. V-W-03-C-731.

72.    Work Takeover. In the event EPA, in consultation with WDNR, determines that Respondents have ceased implementation of any portion of the Work, are seriously or repeatedly deficient or late in their performance of the Work, or are implementing the Work in a manner which may cause an endangerment to human health or the environment, EPA or WDNR may assume the performance of all or any portion of the Work as the Response Agencies determine necessary. Costs incurred by the United States or the State in performing the Work pursuant to this Paragraph shall be considered Future Response Costs. In accordance with Paragraph 54 (Payment of Future Response Costs), Respondents may be required to reimburse the United States and the State for all such Future Response Costs. Respondents may invoke the procedures set forth in Section XV (Dispute Resolution) to dispute EPA's determination that takeover of the

- 19 -

Work is warranted under this Paragraph.  Notwithstanding any other provision of this Consent Order, EPA and WDNR retain all authority and reserve all rights to take any and all response actions authorized by law.

## XX.  COVENANT NOT TO SUE BY RESPONDENTS AND FORT JAMES CORPORATION

73.     Subject to the reservations in Paragraphs 75 and 76, Respondents and Fort James Corporation covenant not to sue and agree not to assert any claims or causes of action against the United States or the State, or their contractors or employees, with respect to the EPA Past Cost Payment, the Work (including all Future Response Costs paid under this Consent Order), or this Consent Order, including, but not limited to:

        a.      any direct or indirect claim for reimbursement from the Hazardous Substance Superfund established by 26 U.S.C. § 9507, based on Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law;

        b.      any claim arising out of the EPA Past Cost Payment or the Work, including any claim under the United States Constitution, the Constitution of the State of Wisconsin, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended, or at common law; or

        c.      any claim against the United States or the State pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, relating to the EPA Past Cost Payment or the Work.

74.     These covenants not to sue shall not apply in the event the United States brings a cause of action or issues an order pursuant to the reservations set forth in Subparagraphs 70(b), (c), and (e) – (g), but only to the extent that Respondents' claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

75.     Respondents reserve, and this Consent Order is without prejudice to, claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States while acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.  However, any such claim shall not include a claim for any damages caused, in whole or in part, by the act or omission of any person, including any contractor, who is not a federal employee as that term is defined in 28 U.S.C. § 2671; nor shall any such claim include a claim based on the Response Agencies' selection of response actions, or the oversight or approval of Respondents' plans or activities.  The foregoing applies only to claims which are brought pursuant to any statute other than CERCLA and for which the waiver of sovereign immunity is found in a statute other than CERCLA.

76.     Respondents reserve, and this Consent Order is without prejudice to, claims against the State, subject to the provisions of Wis. Stats. § 893.82, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the State while acting within the scope of his office or employment under circumstances where the State, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.  However, any such

- 20 -

claim shall not include a claim for any damages caused, in whole or in part, by the act or omission of any person, including any contractor, who is not a State employee as that term is defined under Wisconsin law; nor shall any such claim include a claim based on the Response Agencies' selection of response actions, or the oversight or approval of Respondents' plans or activities. The foregoing applies only to claims which are brought pursuant to any statute other than CERCLA and for which the waiver of sovereign immunity is found in a statute other than CERCLA.

77. Nothing in this Consent Order shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

## XXI. OTHER CLAIMS

78. Nothing in this Consent Order shall constitute or be construed as a release from any claim, cause of action or demand in law or equity against any person, firm, partnership, subsidiary or corporation not a signatory to this Consent Order for any liability it may have arising out of or relating in any way to the generation, storage, treatment, handling, transportation, release, or disposal of any hazardous substances, pollutants, or contaminants found at, taken to, or taken from Operable Units 2, 3, 4, and/or 5.

79. Respondents specifically reserve all rights and defenses that they may have, including but not limited to any rights to contest any Findings of Fact or Conclusions of Law and Determinations set forth in Sections V and VI of this Consent Order in any proceeding other than an action brought by EPA or the State to enforce this Consent Order. Under this Consent Order, Respondents specifically reserve any right they may have to seek review of the remedial action selected in the ROD as authorized by CERCLA Section 113(h), 42 U.S.C. § 9613(h), other than in an action brought by EPA or the State to enforce this Consent Order.

80. Each party to this Consent Order shall bear its own costs and attorneys fees.

## XXII. CONTRIBUTION PROTECTION AND EFFECT OF SETTLEMENT

81. The Parties agree that Respondents and Fort James Corporation are entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Sections 113(f)(2) and 122(h)(4) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 9622(h)(4), for "matters addressed" in this Consent Order. The "matters addressed" in this Consent Order are the Work. Nothing in this Consent Order precludes the United States, the State, or Respondents from asserting any claims, causes of action, or demands against any persons not parties to this Consent Order for indemnification, contribution, or cost recovery.

82. The Parties agree and acknowledge that the Response Agencies shall recognize that Respondents are entitled to full credit for the EPA Past Cost Payment and all response costs incurred in performance of the Work (including all Future Response Costs paid under this Consent Order), with such credit to be applied against Respondents' liabilities for response costs at the Site; provided, however, that the credit ultimately recognized shall take into account the amount of any recoveries by Respondents of any portion of such payments from other liable persons, such as through a recovery under Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 96707 and 9613.

- 21 -

## XXIII. INDEMNIFICATION

83.     Respondents shall indemnify, save and hold harmless the United States, the State, and their officials, agents, contractors, subcontractors, employees and representatives from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of Respondents, their officers, directors, employees, agents, contractors, or subcontractors, in carrying out actions pursuant to this Consent Order.  In addition, Respondents agree to pay the United States and/or the State all costs incurred by the United States and/or the State, including but not limited to attorneys fees and other expenses of litigation and settlement, arising from or on account of claims made against the United States and/or the State based on negligent or other wrongful acts or omissions of Respondents, their officers, directors, employees, agents, contractors, subcontractors and any persons acting on their behalf or under their control, in carrying out activities pursuant to this Consent Order.  Neither the United States nor the State shall be held out as a party to any contract entered into by or on behalf of Respondents in carrying out activities pursuant to this Consent Order.  Neither Respondents nor any such contractor shall be considered an agent of the United States or the State.

84.     The United States and/or the State shall give Respondents notice of any claim for which the United States and/or the State plan to seek indemnification pursuant to this Section and shall consult with Respondents prior to settling such claim.

85.     Respondents waive all claims against the United States and the State for damages or reimbursement or for set-off of any payments made or to be made to the United States and/or the State, arising from or on account of any contract, agreement, or arrangement between Respondents and any person for performance of response actions on or relating to the Site, including, but not limited to, claims on account of construction delays.  In addition, Respondents shall indemnify and hold harmless the United States and the State with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between Respondents and any person for performance of response actions on or relating to the Site, including, but not limited to, claims on account of construction delays.

## XXIV.  RECORD PRESERVATION

86.     Respondents shall preserve all records and documents which relate to implementation of the RD at Operable Units 2, 3, 4, and/or 5 for a minimum of ten (10) years following completion of Remedial Action construction.  Respondents shall acquire and retain copies of all documents that relate to Remedial Design for Operable Units 2, 3, 4, and/or 5 and are in the possession of its employees, agents, accountants, contractors, or attorneys.  After this 10-year period, Respondents shall notify the Response Agencies at least ninety (90) days before the documents are scheduled to be destroyed.  If EPA or WDNR request that the documents be saved, Respondents shall, at no cost to the Response Agencies, give the Response Agencies the documents or copies of the documents.

## XXV.  NOTICES AND SUBMISSIONS

87.     Documents, including but not limited to reports, approvals, disapprovals, and other correspondence which must be submitted under this Consent Order, shall be sent by overnight delivery or certified mail, return receipt requested, to the following addressees or to any other addressees which the Respondents, EPA, and WDNR designate in writing:

- 22 -

As to the United States:

> James Hahnenberg
> EPA Project Coordinator
> United States Environmental Protection Agency
> 77 West Jackson Blvd., mail code: SR-6J
> Chicago, IL 60604-3590
> Phone: (312) 353-4213
> FAX: (312) 886-4071
> E-mail: Hahnenberg.James@epa.gov

with a copy to:

> Peter Felitti (C-14J)
> Assistant Regional Counsel
> U.S. Environmental Protection Agency
> Region 5
> 77 West Jackson Blvd.
> Chicago, IL 60604
> Phone: (312) 886-5114
> FAX: (312) 886-0747
> E-mail: felitti.peter@epa.gov

As to the State:

> Gregory Hill
> WDNR Project Coordinator
> Wisconsin Department of Natural Resources
>
> P.O. Box 7921                  101 S. Webster St.
> Madison, WI 53707-7921         Madison, WI 53703
> (Regular Mail)                 (Over-Night Mail)
> Phone: (608) 267-9352
> FAX: (608) 267-2800
> E-mail: hillg@dnr.state.wi.us

As to Fort James Operating Company and Fort James Corporation:

> J. Michael Davis
> Principal Counsel - Environmental
> Georgia-Pacific Corporation
> 133 Peachtree Street, N.E.
> Atlanta, GA 30303

with a copy to

> John Hanson
> Beveridge & Diamond, P.C.
> 1350 I Street, N.W. - Suite 700
> Washington, DC 20005

- 23 -

As to NCR:

        Jon Hoak
        NCR Corporation
        1700 South Patterson Blvd., WHQ-5
        Dayton, OH 45479

with a copy to

        J. Andrew Schlickman
        Sidley Austin Brown & Wood LLP
        10 South Dearborn Street
        Chicago, IL  60603

## XXVI.  EFFECTIVE DATE OF CONSENT ORDER

88.    This Consent Order shall become effective upon receipt by Respondents of the Consent Order signed by the Director of the Superfund Division, EPA, Region 5 and the Secretary of the WDNR.

## XXVII.  COMMUNITY RELATIONS

89.    Respondents shall cooperate with the Response Agencies in providing RD information to the public.  If requested by the Response Agencies, Respondents shall participate in the preparation of all RD information disseminated to the public pertaining to Operable Units 2, 3, 4, and/or 5.

## XXVIII.  MODIFICATION OF CONSENT ORDER

90.    In addition to the procedures set forth in Section VIII (Project Coordinators), Section IX (Work to be Performed), Section XV (Dispute Resolution) and Section XVI (Force Majeure), this Consent Order may be amended by mutual agreement of the Parties. Amendments shall be in writing and shall become effective on the date of execution by the Response Agencies.  Project Coordinators do not have the authority to sign amendments to the Consent Order.

91.    No informal advice, guidance, suggestions, or comments by the Response Agencies regarding reports, plans, specifications, schedules, and any other writing submitted by the Respondents will be construed as relieving Respondents of their obligation to obtain such formal approval as may be required by this Consent Order.  Any deliverables, plans, technical memoranda, reports (other than progress reports), specifications, schedules and attachments required by this Consent Order are, upon approval by the Response Agencies, incorporated into this Consent Order; provided, however, any time frames under this Consent Order can be extended by the Response Agencies' Project Coordinators in writing.

## XXIX.  NOTICE OF COMPLETION

92.    At the request of Respondents, the Response Agencies shall promptly determine whether all actions have been performed in accordance with this Consent Order, except for certain continuing obligations required by this Consent Order (e.g., record retention).  Any request shall demonstrate in writing that such actions have been performed in accordance with

- 24 -

this Consent Order and shall be accompanied by the following attestation by a responsible official for the Respondents (or Fort James Corporation): "I certify that the information contained in or accompanying this certification is true, accurate, and complete." Upon such determination by the Response Agencies, the Response Agencies will promptly provide written notice to Respondents. Such notice will not be unreasonably withheld. If the Response Agencies determine that any required response activities have not been completed in accordance with this Consent Order, they will notify Respondents, provide a list of the deficiencies, and require that Respondents correct such deficiencies.

## XXX. MISCELLANEOUS

93.     In accordance with the SOW, Respondents may recommend to the Response Agencies that the Response Agencies adopt the contingent remedies in the ROD or any alternate remedies. At that time, Respondents shall provide the Response Agencies all documentation supporting such recommendation, including without limitation the results of any independent expert review. The Response Agencies will consider any such recommendation made by Respondents.

94.     Until such time as the Response Agencies approve the RD Work Plan (as defined in the SOW), but no later than June 15, 2004 (or such later date as agreed upon in writing by the Response Agencies), either and/or both Respondent(s) may elect to withdraw from the obligation to perform the Work under this Consent Order and the SOW, except for those provisions that relate to pre-design sampling and analysis ("Task 3" of the SOW). At the time of such election, if made, the SOW shall be deemed amended to include only those obligations relating to Task 3 in the SOW (Pre-Design Sampling). This Consent Order shall remain in effect only to the extent necessary to complete the pre-design sampling and analysis. Without limiting the foregoing, such an election will excuse the withdrawing Respondent(s) from submitting the RD Work Plan and from paying Future Response Costs under this Consent Order for any work other than that related to the pre-design sampling and analysis. Section XVIII (Covenant Not to Sue by EPA) and Section XXII (Contribution Protection and Effect of Settlement) shall likewise be limited to pre-design sampling and analysis as to the withdrawing Respondent(s) (and as to the Fort James Corporation, if Respondent Fort James operating Company elects to withdraw). If Respondents have failed to pay the Initial Payment to the United States required by Paragraph 53 at the time they elect to withdraw from the obligation to perform the Work under this Consent Order and the SOW, Respondents shall not be relieved from their obligation to make such payment or from any stipulated penalties incurred for late payment. The Response Agencies shall use their best efforts to respond to the Respondents' draft RD Work Plan within forty-five (45) days of receipt.

95.     In accordance with the provisions set forth in Attachment C to this Consent Order, the Response Agencies intend to devote up to $6.5 million payable under the API/NCR Interim Decree for performance of the Remedial Design for OUs 2-5, as permitted by the API/NCR Interim Decree.

- 25 -

IN THE MATTER OF:
Administrative Order by Consent
Lower Fox River and Green Bay

AGREED AS STATED ABOVE:

FOR NCR CORPORATION

Date:  _February 26, 2004___

Signature

Typed Name: Jon S. Hoak

Title:        Senior Vice President and General Counsel

Address:     1700 South Patterson Blvd.

             Dayton, OH 45479

- 26 -

IN THE MATTER OF:
Administrative Order by Consent
Lower Fox River and Green Bay

AGREED AS STATED ABOVE:

FOR FORT JAMES OPERATING COMPANY, INC.

Date: _February 16, 2004_ _Susan F. Moore_
Signature

Typed Name: Susan F. Moore

Title: Vice President, Environmental Policy

Address: 133 Peachtree Street NE 9th Floor

Atlanta, GA 30303

- 27 -

THE UNDERSIGNED PERSON hereby assents to the covenants set forth in Section XX (Covenant Not to Sue by Respondents and Fort James Corporation) of this Consent Order:

FOR FORT JAMES CORPORATION

Date: _February 16, 2004_ _Susan F. Moore_
_____
Signature

Typed Name: Susan F. Moore _____

Title: Vice President, Environmental Policy _____

Address: 133 Peachtree Street NE 9th Floor ____

Atlanta, GA 30303 _____.

_____

- 28 -

IN THE MATTER OF:
Administrative Order by Consent
Lower Fox River and Green Bay


IT IS SO ORDERED AND AGREED:


U.S. ENVIRONMENTAL PROTECTION AGENCY


BY: _____     DATE: _____
     Richard Karl, Acting Director
     Superfund Division
     U.S. Environmental Protection Agency
     Region 5


WISCONSIN DEPARTMENT OF NATURAL RESOURCES


BY: _____     DATE: _____
     Scott Hassett, Secretary


- 29 -

**Consent Order Attachment A**

**Statement of Work**

**STATEMENT OF WORK**
**FOR THE REMEDIAL DESIGN FOR**
**OPERABLE UNITS 2, 3, 4 AND 5 AT THE**
**LOWER FOX RIVER AND GREEN BAY SITE**
**BROWN, OUTAGAMIE, AND WINNEBAGO COUNTIES, WISCONSIN**

I.      **PURPOSE**

This Statement of Work (SOW) sets forth the requirements for the Remedial Design for Operable Units 2,

3, 4 and 5 (RD) for all components of the remedial action set forth in the Records of Decision (RODs) for

the Lower Fox River and Green Bay Site (Site).[1]  The ROD for Operable Units (OUs) 1 and 2 was signed

by the Deputy Administrator, Water Division, Wisconsin Department of Natural Resources (WDNR), and

the Superfund Director of the U.S. Environmental Protection Agency Region 5 (EPA) on December 18,

2002 and December 20, 2002, respectively.  The ROD for OUs 3, 4 and 5 was signed by the Deputy

Administrator, WDNR Water Division, and the Superfund Director of EPA Region 5 on June 30, 2003.

This SOW addresses only the RD for OUs 2 - 5.  The Remedial Design for OU 1 is being addressed under

a separate SOW and Consent Order.  Respondents, working collaboratively with WDNR and EPA

(Response Agencies) as set forth herein, will develop the RD consistent with the RODs, the

Administrative Order on Consent (AOC) to which this SOW is attached, the Remedial Design Work Plan

to be developed hereunder, and EPA Superfund Remedial Design and Remedial Action Guidance

(OSWER Directive 9355.0-4A) for designing remedial actions.  The AOC and this SOW do not require

the Respondents to implement the remedy.

II.      **DESCRIPTION OF THE REMEDIAL ACTION / PERFORMANCE STANDARDS**

The Respondents shall design the remedy necessary to meet the Performance Standards and specifications

set forth in the RODs for OUs 2, 3, 4 and 5, as discussed below.  The Remedial Design shall address the

timing and sequencing of the remedial action to account for the multifaceted and multi-year components

of the remedy.  The Response Agencies and Respondents will collaboratively seek to resolve key

technical and implementation issues through the timely use of Work Groups.  Appropriate consideration

---

[1] "Operable Unit 2" or "OU2" is the portion of the Lower Fox River (and the underlying River sediment)
starting at the Upper Appleton Dam downstream to the Little Rapids Dam.  "Operable Units 3, 4, and 5"
or "OUs 3 - 5" is the portion of the Lower Fox River (and the underlying River sediment) starting at the
Little Rapids Dam downstream to the bay of Green Bay and includes all of Green Bay from the city of
Green Bay to the point where Green Bay enters Lake Michigan.

of the contingent remedy provisions of the ROD, and such other work as proposed and/or conducted by Respondent under the AOC, may also be incorporated into the Remedial Design process.

**OPERABLE UNIT 2 (EXCLUDING DEPOSIT DD).** The selected remedy for OU 2 is Monitored Natural Recovery (MNR). An institutional control plan and a long-term monitoring plan for PCB and possibly mercury levels in water, sediment, invertebrates, fish and birds will be developed during the RD. Institutional controls may include access restrictions, land use or water use restrictions, dredging moratoriums, fish consumption advisories, and domestic water supply restrictions. Land and water use restrictions and access restrictions may require local or state legislative action to prevent inappropriate use or development of contaminated areas. Plans for monitoring will be developed during the Remedial Design and modified during and after the upstream construction in OU 1, as appropriate. The monitoring program will be developed to effectively measure achievement of and progress towards Remedial Action Objectives (RAOs).

**OPERABLE UNITS 3 AND 4 (AND OU 2 DEPOSIT DD).** The selected remedy for OUs 3 and 4 includes the removal of sediment with PCB concentrations greater than the 1 ppm remedial action level (RAL) using an environmental dredge, followed by dewatering and off-site disposal of the sediment. This remedy includes the following:

- **Site Mobilization and Preparation.** The staging area(s) for these Operable Units will be determined during the design stage. Site preparation at the staging area(s) will include collecting soil samples for design and baseline characterization, securing the onshore property area for equipment staging, and constructing the necessary onshore facilities for sediment management and transportation.

- **Sediment Removal.** Sediment removal will be conducted using a dredge (e.g., cutterhead or horizontal auger or other method) or other suitable sediment removal equipment.

- **Sediment Dewatering.** Sediment that is removed will require dewatering.

- **Sediment Disposal.** Sediment disposal includes the transportation of the sediment to a dedicated NR 500 engineered landfill.

2

- **Water Treatment.** Unless other arrangements can be made, water treatment will consist of flocculation, clarification, sand filtration, and treatment through activated carbon filters.

- **Demobilization and Site Restoration.** Demobilization and site restoration will involve removing all equipment from the staging and work areas and restoring the site to, at a minimum, its original condition before construction of the staging area commenced.

- **Institutional Controls and Monitoring.** Plans for monitoring of various media (e.g., water, tissue, and sediment) to determine the effectiveness of the overall remedy will be developed during RD. Baseline monitoring will include pre- and post-remedial sampling of water, sediment, and biological tissue. Monitoring during implementation will include air and surface water sampling. Plans for monitoring during and after construction will be developed during the Remedial Design and modified during and after construction, as appropriate. A long-term monitoring and institutional control plan will be developed as part of the RD. Institutional controls may include access restrictions, land use or water use restrictions, dredging moratoriums, fish consumption advisories, and domestic water supply restrictions. Land and water use restrictions and access restrictions may require local or state legislative action to prevent inappropriate use or development of contaminated areas.

- **Achievement of Remedial Action Level Objective.** The mass and volume to be remediated will be determined by (1) establishing a dredge elevation based on a RAL of 1 ppm or, if sampling conducted after dredging is completed shows that the 1 ppm RAL has not been achieved, (2) by achieving a Surface Weighted Average Concentration (SWAC) of 0.26 ppm for OU 3 and 0.25 ppm for OU 4.[2] Sampling will be conducted to determine if the RAL or SWAC have been achieved. The SWAC will be computed following completion of the dredging with samples collected from 0 to 10 centimeters (cm) below mudline. The SWAC is an acceptable level of performance for determining completion of the remedial action. If the appropriate SWAC has not been achieved in either OU 3 or OU 4, the ROD provides for certain options to further reduce risk. These

---

[2] The Parties recognize that an Explanation of Significant Differences or ROD Amendment issued by the Response Agencies could result in an alternative RAL or SWAC.

options include additional dredging and placement of a sand cover over dredged areas to reduce surficial concentrations such that a SWAC is achieved.

**OPERABLE UNIT 5.** The selected remedy for OU 5 includes Monitored Natural Recovery (MNR) with institutional controls and limited dredging. This remedy includes the following:

- **Additional Sampling / Dredging.** Additional sampling near the mouth of the Lower Fox River will be conducted to identify sediments with PCB concentrations greater than 1 ppm. Any PCB-contaminated sediments adjacent to the River mouth with concentrations greater than 1 ppm will be dredged as an extension of the OU 4 removal.

- **Institutional Controls and Monitoring.** An institutional control plan and a long-term monitoring plan for PCB and possibly mercury levels in water, sediment, invertebrates, fish and birds will be developed during RD. Institutional controls may include access restrictions, land use or water use restrictions, dredging moratoriums, fish consumption advisories, and domestic water supply restrictions. Land and water use restrictions and access restrictions may require local or state legislative action to prevent inappropriate use or development of contaminated areas. Plans for monitoring will be developed during the Remedial Design and modified during and after the upstream construction in OUs 3 and 4, as appropriate. The monitoring program will be developed to effectively measure achievement of and progress towards Remedial Action Objectives (RAOs).

**CONTINGENT REMEDY – *IN SITU* CAPPING.** Capping of certain areas in OUs 3 and 4 may be proposed during design and will be given consideration by the Response Agencies, consistent with the requirements of the ROD for selection of the contingent remedy. The specific areas where caps could be placed may be determined during RD.

## III.    SCOPE OF REMEDIAL DESIGN

The Remedial Design shall be consistent with the RODs for OUs 2 - 5. Specific tasks are described below.

**Task 1:  Remedial Design Work Plan**

No later than March 31, 2004, Respondents will submit a complete Remedial Design Work Plan (RD Work Plan) to the Response Agencies for their review and approval.  The RD Work Plan shall discuss how each component of the remedy for OUs 2 - 5 will be addressed, identify tasks necessary for completing the pre-design investigations, including baseline condition monitoring, and design work required by the ROD for OUs 2 - 5, and provide an overall management strategy for completion of such tasks.  The RD Work Plan will also include a project schedule for each major activity and submission of deliverables to be generated during the Remedial Design.  The RD Work Plan shall document the responsibility and authority of all organizations and key personnel involved with the design and shall include a description of qualifications of key personnel directing the Remedial Design, including contractor personnel.

Respondents shall submit the RD Work Plan to the Response Agencies for review and approval in accordance with the Consent Order and Section V of this SOW.  Once the Response Agencies approve the RD Work Plan, Respondents shall implement the plan in accordance with the approved schedule therein.  The RD Work Plan and schedule may require amendment if new information is discovered that was not anticipated at the time the Work Plan was developed, or if any changes are made in design or management strategy.

**Task 2:  Review and Analysis of Existing Data**

While developing the RD Work Plan, Respondents will compile existing available data into a suitable geographical information system (GIS) platform to provide a detailed assessment of the extent of contamination, sources of contamination, bathymetry and sub-bottom profiles of the river channel and side-slope areas, and location of candidate areas for active remediation or MNR, based on the RODs.  This effort will evaluate the need for additional data.  Additionally, information on future land use planning, including future dredging and channel de-authorization plans, and Water Resources Development Act (WRDA) feasibility study plans and activities, will be compiled.

**Task 3:  Pre-design Sampling**

No later than March 31, 2004, Respondents will submit a Pre-design Sampling Plan for OUs 2 - 5 to the Response Agencies for their review and approval.  The Pre-design Sampling Plan will provide detailed descriptions for pre-design field and analytical evaluations of sediment in OUs 2 - 5, and will consist of a

5

Sampling and Analysis Plan (SAP), a Quality Assurance Project Plan (QAPP), and a Health and Safety Plan (HSP). The Pre-design Sampling Plan either will incorporate existing baseline bathymetric and related surveys or will propose detailed modifications or additions to such surveys to be performed by Respondents. Respondents will submit any necessary modifications to these documents for review and approval prior to implementing the pre-design sampling activities. Upon approval of the Pre-Design Sampling Plan by the Response Agencies, Respondents shall perform the tasks set forth therein in accordance with the applicable schedules in the Pre-design Sampling Plan and RD Work Plan.

The overall objectives of the pre-design sampling include:

- Filling in data gaps identified following examination of existing data;
- Determining the area and volume of sediment requiring remediation;
- Providing sufficiently comprehensive data to allow implementation of dredging, dewatering, transportation, treatment and/or disposal options.

Locations for pre-design sampling will be identified based on available information regarding sediment stratigraphy and geomorphology, current and historical contamination sources, and existing sediment quality data. Initial geomorphology mapping of sediment thickness in the river may be performed to further characterize sediment distribution patterns and to optimize the placement of sediment sampling locations. Core stations will be located to optimize characterization of the volume of surface and/or subsurface sediment contamination likely requiring active remediation, consistent with ROD requirements. The Pre-design Sampling Plan will identify the sample locations and the basis for their selection.

Raw data and validated sample results will be submitted in accordance with provisions of the AOC. Respondents will evaluate existing data and the data collected in the pre-design sampling in order to meet the following data evaluation objectives:

- To define the area and volume of sediment requiring remediation through spatial resolution of surface and subsurface PCB chemical concentration distributions;
- To define the physical and chemical nature and features of the sediment (e.g., grain size, total organic carbon, sediment stability, and load-bearing properties) and the river channel (e.g., currents, slope and

6

engineered structures) necessary for implementation of the remedy described in the ROD and, if appropriate, the contingent remedy (capping);

• To assess on a preliminary basis sediment contaminant mobility in connection with dredging and capping, including: column leach tests, pore water test, standard elutriate test, modified elutriate test, and column settling test;

• To establish baseline conditions of those features that may be altered during the remedial action, such as bathymetry and sediment quality;

• To evaluate potential integration of current and planned property uses (e.g., WRDA authorities, maintenance dredging, and piers/berthing areas) with prospective remedial actions; and

• To determine additional data needed for remedial design.

**Task 4:  Basis of Design Report**

Within 180 days of the completion of pre-design sampling and validation of data, Respondents shall submit a Basis of Design Report for review and approval by the Response Agencies.  The Basis of Design Report shall include all information collected during the pre-design investigation, a summary of information collected and analyses conducted to date for the Lower Fox River Site design (e.g., OU 1 work information), as well as appropriate literature and design references.

The Basis of Design Report shall include preliminary delineations of remediation areas and technologies, and preliminary identifications of dewatering, transportation, treatment and disposal technologies and locations.  The Basis of Design Report will also define volumes and areas to be dredged, and will contain analyses of information and data supporting such designation and volumes.  The designation of sediment deposits for removal will be subject to approval by the Response Agencies and be consistent with the RODs for OUs 2 - 5.  The Basis of Design Report shall identify dewatering, transportation, treatment and disposal options, including Respondents' recommendations regarding such design elements.  The approved Basis of Design Report shall reflect the Response Agencies' selected design elements (subject to later modification as appropriate).

After approval of the Basis of Design Report (or as otherwise agreed to by the Parties), the Response Agencies and Respondents will together begin an outreach effort with respect to those parties with an interest in dewatering, transportation, treatment and disposal options identified in the report (stakeholder outreach).

In conjunction with the Basis of Design Report, Respondents may present information relating to alternative remedial measures for Response Agencies' approval, including but not limited to the contingent remedy set forth in the ROD (see Section IV, below).  If modifications to the Basis of Design Report are necessary due to information obtained during stakeholder outreach, then the Basis of Design report will be modified when that information has been evaluated.

**Task 5:  Remedial Design**

Following completion and approval of the Basis of Design Report, Respondents shall prepare construction plans and specifications to implement the Remedial Action at OUs 2, 3, 4 and 5, as described in the ROD, this SOW and the RD Work Plan, and consistent with the approved Basis of Design Report. Such plans and specifications shall be submitted in accordance with the schedule set forth in Section V below.  Subject to approval by the Response Agencies, Respondents may submit more than one set of design submittals reflecting different components of the Remedial Action.  All design plans and specifications shall be developed consistent with EPA's Superfund Remedial Design and Remedial Action Guidance (OSWER Directive No. 9355.0-4A), except as otherwise specified in this SOW or the RD Work Plan, and shall demonstrate that the Remedial Action based on the final Remedial Design will meet the objectives of the Consent Order and the ROD, including all Performance Standards. Respondents shall meet regularly with the Response Agencies to discuss and work collaboratively on design issues.

**A.      Preliminary Design (30%)**

Respondents shall submit the Preliminary Design for OUs 2, 3, 4 and 5 to the Response Agencies for review and approval when the design effort is approximately 30% complete.  Portions of the Preliminary Design that may be completed prior to the entire Preliminary Design should be submitted as they are completed.  The Preliminary Design submittal shall include or discuss, at a minimum, the following:

- Preliminary plans, drawings, and sketches, including design calculations;

- Determination of specific technologies for sediment dredging, dewatering, transportation and disposal of dredged sediments and associated wastewaters. These determinations will build upon previous engineering analyses;

- Results of studies and additional field sampling and analysis, if any, conducted after the Pre-Design sampling;

- Design assumptions and parameters, including design restrictions, process performance criteria, appropriate unit processes for the treatment train, and expected removal or treatment efficiencies for both the process and waste (concentration and volume), as applicable;

- Sediment Removal Verification/Capping Plan (see Paragraph E below) including the proposed cleanup verification methods (i.e., probing methods) and compliance with Applicable or Relevant and Appropriate Requirements (ARARs);

- Outline of required specifications;

- Proposed siting/locations of processes/construction activity;

- Proposed disposal locations based upon effectiveness, implementability and cost;

- Mitigation Plan to restore habitats that have been physically impacted by sediment removal equipment or soil excavation equipment (not including the soft sediment deposits themselves);

- Expected long-term monitoring and operation requirements;

- Real estate, easement, and permit requirements;

- Preliminary construction schedule, including contracting strategy;

- Significant new information from other projects and activities on the River (e.g., OU 1 activities) and elsewhere; and

- Draft adaptive management plan for the Remedial Action.

If available, additional sampling, analysis, and/or pilot studies necessary to supplement pre-design sampling and to provide additional information to modify the Basis of Design Report and remedial design documents will be incorporated into the Preliminary Design. This data may fill in any remaining site-

9

specific data gaps, potentially including further delineation of the area and volume of sediments requiring remediation, data necessary to further characterize prospective disposal site(s) (including physical, chemical, and biological characteristics), or any other data necessary to complete design activities.

**B.      Intermediate Design (60%)**

Respondents shall submit an Intermediate Design when the design effort is 60% complete.  The Intermediate Design shall be consistent with Response Agency approval of the Preliminary Design.  The Intermediate Design documents will build on those elements listed for the Preliminary Design (30%) documents, and will also include the following:

- Modifications to Plans and specifications in the Preliminary Design (30%) in response to the Response Agencies' comments;

- Draft Construction Quality Assurance Project Plan (CQAPP) (see Paragraph E below);

- Draft Operation, Maintenance, and Monitoring Plan (OMMP) for OUs 2, 3, 4 and 5, as appropriate;

- Draft Monitoring Plan for OUs 2 and 5;[3]

- Capital and Operation and Maintenance Cost Estimate;

- Project Schedule for the construction and implementation of the remedial action; and

- The following supporting plans (see Paragraph E, below):

    - Health and Safety Plan

    - Contingency Plan.

**C.      Pre-Final Design (90%)**

The Respondents shall submit the Pre-Final Design when the design effort is 90% complete.  The Pre-Final Design shall be consistent with Response Agency approval of the Intermediate Design (60%).  The Pre-Final Design submittals shall include those elements listed for the Preliminary Design and Intermediate Design, as well as the following:

- Construction Quality Assurance Project Plan;

- Final Health and Safety Plan;

- Final Contingency Plan;

---

[3]  The RD Work Plan shall set forth the schedule for finalization of the OMMP for OUs 2 through 5, as appropriate, and the Monitoring Plan for OUs 2 and 5.

- Final Sediment Removal Verification / Capping Plan;

- Capital and Operation and Maintenance Cost Estimate. This cost estimate shall refine the Feasibility Study cost estimate to reflect the detail presented in the Pre-Final Design;

- Final Project Schedule for the construction and implementation of the Remedial Action addressed in this SOW which identifies timing for initiation and completion of all critical path tasks. The final project schedule submitted as part of the Final Design shall include specific dates for completion of the project and major milestones. Specific dates will assume and be dependant upon, a defined start date.

**D.     Final Design (100%)**

The Respondents shall submit the Final Design when the design effort is 100% complete. The Final Design shall be consistent with Response Agency approval of the Pre-Final Design (90%) and shall include reproducible drawings and specifications suitable for bid advertisement. The Final Design submittals shall include those elements listed for the Pre-Final Design.

**E.     Content of Supporting Plans**

**1.     Health and Safety Plan (HSP)**

Respondents shall develop and submit to the Response Agencies for review and approval a site-specific HSP which is designed to protect construction personnel and area residents from physical, chemical, and other hazards posed by any work at the Site during the RA. The Health and Safety Plan shall follow OSHA requirements as outlined in 29 CFR §§ 1910 and 1926.

**2.     Contingency Plan**

Respondents shall develop and submit to the Response Agencies for review and approval a Contingency Plan that describes the mitigation procedures they will use in the event of an accident or emergency at the Site. The Contingency Plan may be incorporated into the HSP. The final Contingency Plan shall be submitted prior to the start of construction, in accordance with the approved construction schedule. The Contingency Plan shall include, at a minimum, the following:

a.     Name of the person or entity responsible for responding in the event of an emergency incident;

b.      Plan and date to meet with the local community, including local, State and Federal agencies involved in the Remedial Action, as well as local emergency squads and hospitals; and,

c.      First aid medical information

### 3.      Construction Quality Assurance Project Plan (CQAPP)

Respondents shall develop and submit to the Response Agencies for review and approval a CQAPP which describes the site specific components of the quality assurance program that the Respondents shall use to ensure that the completed project meets or exceeds all design criteria, plans, and specifications. The final CQAPP shall be submitted in accordance with the approved RA Work Plan schedule. The CQAPP shall contain, at a minimum, the following elements:

a.      Responsibilities and authorities of all organizations and key personnel involved in the construction of the Remedial Action.

b.      Qualifications of the Quality Assurance Official to demonstrate that he/she possesses the training and experience necessary to fulfill his/her identified responsibilities.

c.      Protocols for sampling and testing used to monitor the remedial action.

d.      Identification of proposed quality assurance sampling activities including the sample size, locations, frequency of testing, acceptance and rejection data sheets, problem identification and corrective measures reports, evaluation reports, acceptance reports, and final documentation.

e.      Reporting requirements for CQAPP activities shall be described in detail in the CQAPP. This shall include such items as daily summary reports, inspection data sheets, problem identification and corrective measures reports, and design acceptance reports, and final documentation. Provisions for the final storage of all OUs 2 - 5 cleanup records shall be presented in the CQAPP.

### 4.      Sediment Removal Verification/Capping Plan

As a component of the CQAPP, Respondents shall develop and submit a Sediment Removal Verification/Capping Plan to the Response Agencies for review and approval. The purpose of the Sediment Removal Verification/Capping Plan is to provide a mechanism to ensure that Performance

Standards for the Remedial Action are met. Once approved, the Sediment Removal Verification/Capping Plan shall be implemented on the approved schedule. The Sediment Removal Verification/Capping Plan shall include, at a minimum:

  a.     Quality Assurance Project Plan (may be part of RA QAPP);

  b.     Health and Safety Plan (may be part of RA HSP); and

  c.     Field Sampling Plan.

## IV.    CONTINGENT REMEDY / SUPPLEMENTAL INVESTIGATIONS

If Respondents, consistent with the ROD capping contingency, propose capping any area as part of the final remedy, Respondents shall provide a detailed submittal with technical justification supporting such a proposal to the Response Agencies for review and approval. This submittal shall be consistent with ROD Sections 13.4 and 13.5 and all appropriate EPA Guidance, and in accordance with a schedule established in the approved RD Work Plan.

As provided in Paragraph 28 of the AOC, Respondents may undertake voluntary, supplemental, work relating to OUs 2, 3, 4, or 5, or to remedial design issues not specifically covered in the AOC and this SOW. The Response Agencies will review and comment promptly on such work and consider any recommendations made by Respondents based on such work.

If Respondents, based on investigation activities and assessments conducted during the design phase, propose that alternative remedial measures be designated by the Response Agencies for any portion of OUs 2 - 5, Respondents shall provide a detailed submittal with technical justification supporting such a proposal to the Response Agencies for review and approval. The submittal shall be consistent with all appropriate EPA Guidance. Approval of the proposal will require either an Explanation of Significant Differences or a ROD Amendment by the Response Agencies before it becomes effective. The submittal shall be in addition to all other submittals required by this SOW, and shall not delay the submittal of other design documents. Respondent may make a submittal proposing alternate remedial measures, and the Response Agencies will consider the submittal, either during design or after the Final Design is completed, but before remedial action commences in the portion(s) of OU 2 - 5 addressed by the submittal.

## V    SUMMARY OF MAJOR DELIVERABLES / SCHEDULE

A summary of the project schedule and reporting requirements for each task of the OUs 2 - 5 Remedial

Action contained in this OU 2 - 5 RD SOW is presented below.  Unless modified by the final RD Work

Plan or otherwise approved in writing by the Project Coordinators, the project schedule will be as follows:

| Deliverable / Milestone | Due Date (calendar days) |
|---|---|
| Pre-design Sampling Plan | March 31, 2004 |
| RD Work Plan | March 31, 2004 |
| Final RD Work Plan | As provided in the AOC. |
| Monthly Progress Reports | As described in the AOC. |
| Pre-design Sampling | Weather permitting, within Sixty (60) days of approval of the Pre-design Sampling Plan. |
| Basis of Design Report | One hundred eighty (180) days after receipt of validated data from the pre-design sampling investigation. |
| Preliminary Design (30%) | One hundred twenty (120) days after approval of the Basis of Design Report. |
| Intermediate Design (60%) | Ninety (90) days after approval of the Preliminary Design. |
| Pre-Final Design (90%) | Ninety (90) days after approval of the Intermediate Design. |
| Final Design (100%) | Sixty (60) days after approval of the Pre-Final Design. |

14

**Consent Order Attachment B-1**

**Map of Operable Unit 2**



Figure 7-21. Sediment Management Area Overview: Appleton to Little Rapids

Case 2:06-cv-00484-LA Filed 04/12/06 Page 47 of 59 Document 2-3

**Consent Order Attachment B-2**

**Map of Operable Unit 3**



**N**
**W** - **E**
**S**

De Pere Dam

Deposit GG

Deposit HH

DE PERE

Deposit FF

Deposit EE

LOST DAUPHIN STATE PARK

Lock

Little Rapids (Kaukauna) Dam

**Legend:**

- Deposits
- ✚ Possible Equipment Access
- TSCA Areas
- Upland Staging

**Action Level Profile (ppb)**
- >125
- >250
- >500
- >1,000
- >5,000
- Dam Locations
- Bridges
- Railroads
- Roads
- Wisconsin State Parks
- Wetlands
- Water

**Civil Divisions**
- City
- Village

1 0 1 Kilometers

0.5 0 0.5 1 Miles

Project Area

1. Basemap generated in ArcView GIS, Version 3.2, 1998, and from TIGER census data, 1995.
2. Deposit and management area data obtained from WDNR, and are included in the Fox River database.
3. Action level profile for PCBs considered for all depth layers up to 360 cm for lower Fox River.

Natural Resource Technology

Lower Fox River Feasibility Study

Sediment Management Area Overview:
Little Rapids to De Pere

FS-14414-535.7-25

3/1301

FIGURE 7-26

**Consent Order Attachment B-3**

**Map of Operable Unit 4**



**GREEN BAY**

Renard (Kidney) Island CDF

SMU Group 110-115
SMU Group 104-109
SMU Group 98-103
SMU Group 92-97
SMU Group 86-91
SMU Group 80-85
SMU Group 74-79
SMU Group 68-73
SMU Group 62-67
SMU Group 56-61
SMU Group 50-55
SMU Group 44-49
SMU Group 38-43
SMU Group 32-37
SMU Group 26-31
SMU Group 20-25

BAYVIEW PARK
EASTMAN PARK
WHITNEY PARK
JACKSON PARK
BAIRD PARK
SAINT JAMES PARK

*GREEN BAY*
*ASHWAUBENON*
*ALLOUEZ*
*DE PERE*

De Pere Dam

Bayport Dredged Material Disposal Area

Legend:
- Sediment Management Units
- Possible Equipment Access
- TSCA Areas
- Upland Staging
- Action Level Profile (ppb)
  - >125
  - >250
  - >500
  - >1,000
  - >5,000
- Dam Locations
- Bridges
- Railroads
- Roads
- Wisconsin State Parks
- Wetlands
- Water
- Civil Divisions
  - City
  - Township

1   0   1   2 Kilometers
1   0   1 Miles

Project Area

1. Basemap generated in ArcView GIS, Version 3.2, 1996, and from TIGER census data, 1994.
2. Deposit and management area data obtained from WDNR, and are included in the Fox River database.
3. Action level profiles for PCBs considered for all depth layers up to 360 cm for lower Fox River.

Natural Resource Technology

Lower Fox River Feasibility Study

Sediment Management Area Overview: De Pere to Green Bay

FIGURE 7-36

FS-14414.535.7.31

**Consent Order Attachment B-4**

**Map of Operable Unit 5**



**Legend:**

- ✚ **Possible Equipment Access**
- ⊕ **Existing Confined Disposal Facility**
- ⊠ **Upland Staging**

**Action Level Profile (ppb)**
- >500
- >1,000
- >5,000
- **Railroads**
- **Roads**
- **Wisconsin State Parks**
- **Wetlands**
- **Water**

**Civil Divisions**
- **City**
- **Township**
- **Village**

10  0  10  20  30  Kilometers

10  0  10  20  Miles

Project Area

1. Basemap generated in ArcView GIS, Version 3.3, 1996, and then TIGER census data, 1995.
2. Deposit and management area data obtained from WDNR, and are included in the Fox River database.
3. Action level profiles for PCBs considered for all depth layers up to >30 cm for Green Bay.

Natural Resource Technology

Lower Fox River Feasibility Study

Sediment Management Area Overview

FIGURE 7-49

**Consent Order Attachment C**

**Partial Funding of Remedial Design with Funds Available under API/NCR Interim Decree**

     1.     <u>Background and Purpose</u>.

        a.     <u>The API/NCR Interim Decree</u>.  Pursuant to the Consent Decree in <u>United States and the State of Wisconsin v. Appleton Papers Inc. and NCR Corporation</u>, Case No. 01-C-0816 (E.D. Wis.), Appleton Papers Inc. and NCR Corporation (collectively "API/NCR") are obligated to provide Plaintiffs up to $10 million per year over the four-year term of that Decree (up to $40 million in total), to be applied toward response action projects and natural resource damage restoration projects relating to the Site.  A separate Memorandum of Agreement among the Plaintiffs and other Inter-Governmental Partners provides that approximately one-half of the $40 million payable under the API/NCR Interim Decree shall be used to implement response action projects and that the remainder shall be used to implement natural resource restoration projects.  Funds under that Decree can also be used as partial funding for larger projects that are also funded in part from other funding sources.  As set forth in detail in the API/NCR Interim Decree, within 21 days after Plaintiffs provide API/NCR a good faith written estimate of additional funds required for projects to be performed over the next six months, API/NCR are obligated to deposit the requested funds in a specially-established Escrow Account (the "Interim Decree Escrow Account"), subject to the $10 million annual funding limitation.  Funding provided for response action projects under Subparagraph 11.a of the API/NCR Interim Decree can be further disbursed from the Interim Decree Escrow Account to EPA, to WDNR, or to any WDNR contractor or designee, for use in conducting or financing response action projects at or in connection with the Site.

        b.     <u>The Response Agencies' Intention to Devote $6.5 Million from the API/NCR Interim Decree for the Remedial Design</u>.  The Response Agencies intend to devote up to $6.5 million payable under the API/NCR Interim Decree for performance of the Remedial Design for OUs 2-5, as permitted by the API/NCR Interim Decree.  Consistent with that intention, the Response Agencies shall use their best efforts to have $6.5 million available for funding response action projects under the API/NCR Interim Decree deposited in the Interim Decree Escrow Account and further disbursed to Respondents, as partial reimbursement for certain Remedial Design costs to be incurred by Respondents.  More specifically, as detailed by this Attachment, the Response Agencies shall use their best efforts to have up to $3.0 million disbursed to Respondents by December 2004, and to have a total of up to $6.5 million disbursed to Respondents.  The Parties agree that Respondents NCR Corporation and Fort James Operating Company are authorized to receive such disbursements from the Interim Decree Escrow Account, as WDNR designees for purposes of this Attachment, based on the obligations assumed by Respondents under the Consent Order.

        c.     <u>Relationship Between this Attachment and Certain Consent Order Provisions.</u>

           (1)     A Respondent shall not be entitled to seek reimbursement of any Remedial Design costs under this Attachment if the Respondent elects to withdraw from the Consent Order pursuant to Consent Order Paragraph 94.  If only one Respondent withdraws, the remaining Respondent may seek reimbursement for its own Remedial Design costs, as provided by this Attachment, but the remaining Respondent may not seek reimbursement for any Remedial Design costs incurred or paid by the withdrawing Respondent.  If one Respondent withdraws, the plural term "Respondents" in this Attachment shall be construed to apply only to the remaining Respondent.

-i-

(2)     The Respondents' obligations to make required payments and to perform the Work under the Consent Order are not contingent, conditioned, or dependent on the availability of funding or reimbursement under this Attachment.  The Respondents shall be bound to comply with the Consent Order even if funding or reimbursement is not available under this Attachment, such as if:  (i) API/NCR default on a payment obligation under the API/NCR Interim Decree; or (ii) the API/NCR Interim Decree is terminated.

2.     <u>Allowable RD Costs and Periodic Cost Reports.</u>

a.     <u>Allowable RD Costs.</u>  Solely for the purpose of this Attachment, the term "Allowable RD Costs" is defined as necessary response costs incurred and paid by Respondents for Remedial Design activities that are eligible for reimbursement under this Attachment, excluding the following costs that shall not be eligible for reimbursement as Allowable RD Costs:

(1)     any payments made by Respondents to the Response Agencies pursuant to the Consent Order, including, but not limited to:  (i) any payments to the Response Agencies under Consent Order Section XIV (Payment of Response Costs);  and (ii) any stipulated penalties paid pursuant to Consent Order Section XVII (Stipulated Penalties);

(2)     attorneys' fees and costs;

(3)     costs of any response activities that Respondents perform that are not required under, or specifically approved by the Response Agencies pursuant to the Consent Order, the Pre-design Sampling Plan, or the RD Work Plan;

(4)     costs related to Respondents' litigation, settlement, development of potential contribution claims or identification of potentially responsible parties;

(5)     Respondents' internal costs, including, but not limited to, salaries, travel, or in-kind services, except for those costs that represent the work of Respondents' employees directly performing the Remedial Design;

(6)     any costs incurred by Respondents prior to the Effective Date of the Consent Order; or

(7)     any costs incurred by Respondents pursuant to Consent Order Section XV (Dispute Resolution).

b.     <u>Periodic Cost Reports.</u>  To request reimbursement of Allowable RD Costs under this Attachment, Respondents shall submit Periodic Cost Reports to the Response Agencies.

(1)     Each Periodic Cost Report shall be submitted jointly by both Respondents, unless one Respondent has withdrawn from the Consent Order pursuant to Consent Order Paragraph 94.

(2)     Each Periodic Cost Report shall:

(i)     specify the amount requested as reimbursement of Allowable RD Costs incurred and paid by Respondents during the reporting period;

-ii-

(ii)    provide a complete and accurate written summary of all Allowable RD Costs for which reimbursement is requested (including a summary of the work performed), certified in accordance with Subparagraph 2.b.(4) of this Attachment;

(iii)    report the aggregate total amounts requested and disbursed to Respondents under this Attachment, as of the date of the Report; and

(iv)    provide instructions for any payment to Respondents.

(3)    In addition to the information required by the preceding Subparagraph:  (i) the first Periodic Cost Report that Respondents submit under this Attachment shall provide a good faith estimate of the total Allowable RD Costs to be incurred and paid through December 2004 (not to exceed $3.0 million); (ii) the first Periodic Cost Report that Respondents submit in 2005 shall provide a good faith estimate of the total Allowable RD Costs to be incurred and paid through June 2005 (not to exceed $6.5 million); and (iii) if a total of $6.5 million has not already been deposited in the Interim Decree Escrow Account pursuant to this Attachment by July 2005, then any Periodic Cost Report that Respondents submit after July 1, 2005 shall include a good faith estimate of the total Allowable RD Costs to be incurred and paid through December 2005 (not to exceed $6.5 million).

(4)    Each Periodic Cost Report shall contain the following certification signed by the Chief Financial Officer of a Respondent or by an Independent Certified Public Accountant retained by the Respondents:

"To the best of my knowledge, after thorough investigation and review of the Respondents' documentation of unreimbursed costs incurred and paid for the work summarized in this report that was performed by the Respondents pursuant to the Consent Order, I certify that the information contained in or accompanying this Periodic Cost Report is true, accurate, and complete.  I am aware that there are significant penalties for knowingly submitting false information, including the possibility of fine and imprisonment."

Each Periodic Cost Report shall include a list of the cost documents that the certifying individuals reviewed in support of the Periodic Cost Report.  Upon request by the Response Agencies, Respondents shall provide the Response Agencies any additional information that the Response Agencies deem necessary for review of a Periodic Cost Report.

(5)    If the Response Agencies find that a Periodic Cost Report includes a mathematical error, an accounting error, costs that are not Allowable RD Costs, costs that are inadequately documented, or costs covered by a prior Periodic Cost Report, the Response Agencies will notify Respondents and Respondents shall cure the deficiency by submitting a revised Periodic Cost Report.

3.    Schedule for Submission of Periodic Cost Reports.

a.    First Periodic Cost Report.  At any time after the final deadline for withdrawal under Consent Order Paragraph 94, Respondents may submit a Periodic Cost Report requesting reimbursement of Allowable RD Costs incurred and paid during the period of time between the Effective Date and a date specified by the Report.  As provided by Subparagraph

2.b.(3) of this Attachment, Respondents first Periodic Cost Report shall also include a good faith estimate of the total Allowable RD Costs to be incurred and paid through December 2004 (not to exceed $3.0 million).

        b.    <u>Subsequent Periodic Cost Reports.</u>  Approximately three months after submission of a prior Periodic Cost Report, Respondents may submit a subsequent Periodic Cost Report requesting reimbursement of additional Allowable RD Costs incurred and paid during the period of time covered by such subsequent Report.  As provided by Subparagraph 2.b.(3) of this Attachment, the first Periodic Cost Report that Respondents submit in 2005 shall also include a good faith estimate of the total Allowable RD Costs to be incurred and paid through June 2005 (not to exceed $6.5 million).  Similarly, if a total of $6.5 million has not already been deposited in the Interim Decree Escrow Account pursuant to this Attachment by July 2005, then any Periodic Cost Report that Respondents submit after July 1, 2005 shall include a good faith estimate of the total Allowable RD Costs to be incurred and paid through December 2005 (not to exceed $6.5 million).

        c.    <u>Limitations on Requests for Reimbursement.</u>  The Periodic Cost Reports submitted by Respondents shall not seek reimbursement of:  (i) more than $3.0 million by December 2004; or (ii) more than $6.5 million in total.

    4.    <u>Requests for Funds Under API/NCR Interim Decree and Disbursements to Respondents.</u>

        a.    <u>First Request for Funds.</u>  Within 30 days of the Response Agencies' receipt of the first Periodic Cost Report under this Attachment, the Response Agencies will make an appropriate request for funds from API/NCR, and will have such funds deposited in the Interim Decree Escrow Account, as permitted by the API/NCR Interim Decree.  The amount requested by the Response Agencies shall be based upon the Respondents' good faith estimate of the total Allowable RD Costs to be incurred and paid through December 2004 (not to exceed $3.0 million).

        b.    <u>Second Request for Funds.</u>  Within 30 days of the Response Agencies' receipt of the Respondents first Periodic Cost Report in 2005, the Response Agencies will make another request for funds from API/NCR (to bring the total requested to not more than $6.5 million), and will have such funds deposited in the Interim Decree Escrow Account.  The amount requested by the Response Agencies shall be based upon the amount previously requested and the Respondents' good faith estimate of the total Allowable RD Costs to be incurred and paid through June 2005 (not to exceed $6.5 million).

        c.    <u>Third Request for Funds.</u>  If a total of $6.5 million has not already been deposited in the Interim Decree Escrow Account pursuant to this Attachment by July 2005, then the Response Agencies will make a third request for funds under this Subparagraph 4.c based on a Periodic Cost Report that Respondents submit after July 1, 2005.  Within 30 days of the Response Agencies' receipt of any such Periodic Cost Report, the Response Agencies will make another request for funds from API/NCR (to bring the total requested to not more than $6.5 million), and will have such funds deposited in the Interim Decree Escrow Account.  The amount requested by the Response Agencies shall be based upon the amount previously requested and the Respondents' good faith estimate of the total Allowable RD Costs to be incurred and paid through December 2005 (not to exceed $6.5 million).

        d.    <u>Disbursements to Respondents from the Interim Decree Escrow Account.</u>
Within 60 days of the Response Agencies' receipt of a Periodic Cost Report requesting reimbursement of Allowable RD Costs under this Attachment, or if the Response Agencies have

requested additional information under Subparagraph 2.b.(4) of this Attachment or a revised Periodic Cost Report under Subparagraph 2.b.(5), within 60 days of receipt of the additional information or the revised Periodic Cost Report, and subject to the conditions set forth in this Attachment, the Response Agencies shall submit a duly-executed escrow disbursement certificate directing the escrow agent to disburse the funds from the Interim Decree Escrow Account to the Respondents as reimbursement of the Allowable RD Costs.  If the Respondents fail to cure a deficiency in a Periodic Cost Report that has been identified by the Response Agencies within 15 business days after being notified of, and given the opportunity to cure, the deficiency, the Response Agencies will recalculate the Allowable RD Costs eligible for reimbursement and will direct the escrow agent to disburse the corrected amount to the Respondents in accordance with the procedures in this Attachment.  The Respondents may dispute the Response Agencies' recalculation under this Paragraph pursuant to Consent Order Section XV (Dispute Resolution).  In no event shall funds be disbursed to Respondents from the Interim Decree Escrow Account in excess of amounts properly documented in a Periodic Cost Report accepted or modified by the Response Agencies.

5.     <u>Termination of Disbursements to Respondents</u>.  The Response Agencies' obligation to disburse funds to the Respondents under this Attachment shall terminate upon the Response Agencies'  determination that Respondents:  (i) have knowingly submitted a materially false or misleading Periodic Cost Report; or (ii) have submitted a materially inaccurate or incomplete Periodic Cost Report, and have failed to correct the materially inaccurate or incomplete Periodic Cost Report within 20 business days after being notified of, and given the opportunity to cure, the deficiency.  The Response Agencies' obligation to disburse funds to the Respondents shall also terminate upon EPA's assumption of performance of any portion of the Work pursuant to Consent Order Paragraph 72 (Work Takeover), when such assumption of performance of the Work is not challenged by Respondents or, if challenged, is upheld under Consent Order Section XV (Dispute Resolution).  Respondents may dispute the Response Agencies' termination of disbursements under this Paragraph pursuant to Consent Order Section XV (Dispute Resolution).

6.     <u>Recapture of Disbursements</u>.  Upon termination of disbursements to Respondents under Paragraph 5 of this Attachment, if the Response Agencies have previously disbursed funds from the Interim Decree Escrow Account for activities specifically related to the reason for termination (*e.g.*, discovery of a materially false or misleading submission after disbursement of funds based on that submission), EPA shall submit a bill to the Respondents for those amounts already disbursed that are specifically related to the reason for termination, plus interest on that amount (at the relevant Superfund rate) covering the period from the date of disbursement of the funds to the date of repayment of the funds by the Respondents.  Within 30 days of receipt of EPA's bill, Respondents shall pay the total amount billed to the Hazardous Substance Superfund by a certified or cashier's check or checks made payable to "EPA Hazardous Substance Superfund" referencing the name and address of the party making payment and EPA Site/Spill Identification Number A565.  Respondents shall send the check(s) to:

U.S. Environmental Protection Agency, Region 5
Program Accounting and Analysis Branch
P.O. Box 70753
Chicago, IL   60673

At the time of payment, Respondents shall send notice that payment has been made to the Response Agencies in accordance with Consent Order Section XXV (Notices and Submissions) and to:

Financial Management Officer
U.S. Environmental Protection Agency, Region 5
Mail Code MF-10J
77 W. Jackson Blvd.
Chicago, IL   60604

Upon receipt of payment, EPA may deposit all or any portion thereof, in the Hazardous Substance Superfund, in the Fox River Site Special Account, or in another Site-specific special account within the Hazardous Substance Superfund.  The determination of where to deposit or how to use the funds shall not be subject to challenge by Respondents pursuant to the dispute resolution provisions of the Consent Order or in any other forum or proceeding.  Respondents may dispute the Response Agencies' determination as to recapture of funds pursuant to Consent Order Section XV (Dispute Resolution).